# Winpenny and Chedester *versus* Philadelphia.

1. The Act of April 14th 1859 relating to obstructions in rivers does not repeal the 28th section of Consolidation Act of 1854, requiring Philadelphia to keep the navigation clear.

2. The Act of 1859 relates to *trading* vessels sunk in *tide* water.

3. The act was to provide for raising and removing vessels in use having some value and having owners, &c., liable to port regulations who could be reached.

[Winpenny *v.* Philadelphia.]

4. An owner is not liable to raise or remove the hulk of a worthless wreck, sunk in navigable waters, nor is he liable for injuries to other navigators.

5. If instead of abandoning a sunken vessel the owner retains such possession and control of it as it is susceptible of, he is bound to exercise a reasonable degree of diligence in removing it.

6. If he attempts to remove the wreck and fails, the inadequacy of the means will not be proof of negligence.

7. A municipal corporation through which a stream passes, is not bound to keep it in a navigable condition.

8. The understanding is that removing obstructions, &c., from navigable streams is upon the state or United States, accordingly as they may be confined within state limits or extending beyond and necessary for inter-state commerce.

9. Such obligation cannot be enforced against the will of the state.

10. By the 28th section of the Consolidation Act the councils of Philadelphia are required to keep the " navigable waters" within its limits clear.

11. " Navigable waters" intended are those without the wharf lines, and the city is liable for negligence in not removing obstructions from them.

12. Pittsburg *v.* Grier, 10 Harris 54, distinguished.

March 24th 1870. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ. READ, J., at Nisi Prius.

Error to the District Court of *Philadelphia :* No. 199, to July Term 1869.

This was an action on the case by William Winpenny and William Chedester against The City of Philadelphia, brought to March Term 1868. The cause of action was the negligence of the defendants in permitting the navigation of the river Schuylkill to be obstructed by a sunken barge, against which the plaintiff's tug-boat struck and was injured.

The evidence was, that about the last of March 1868, the wreck of a canal-boat which had been carried down the Schuylkill by a freshet, sank in the channel opposite South street wharf. The master warden of the port of Philadelphia was informed of the wreck, and having ascertained the name of the owners, he found that they had gone to New York and he could not reach them; " the wreck was of no value, not fit even for firewood; having no funds to pay the expense of the removal, he let it go." After the wreck had been there about a month, the plaintiffs' boat in coming up the river struck the wreck, and after going a short distance sank. Some time afterwards the man who notified the warden removed the wreck, without any contract or obligation for payment; the councils afterwards made an appropriation to pay him. The plaintiffs gave evidence of damages, and closed.

The 28th section of the Act of February 2d 1854, Consolidation Act, Pamph. L. 37, provides, " That after the requisite surveys and soundings shall have been made, it shall be the duty of the city councils to fix the lines beyond which no wharf or pier shall be constructed, ' and to keep the navigable waters within said city for ever open and free from obstruction.' "

[Winpenny v. Philadelphia.]

The Act of April 14th 1859, Pamph. L. 643, provides, that " whereas, frequent obstructions to safe navigation in the Delaware and Schuylkill rivers, within the tide-water thereof, do frequently occur by the sinking of canal-boats, barges and other vessels trading on said rivers, and there being no adequate remedy to compel the owner, master or other agent having charge thereof to raise and remove the same : therefore it shall be the duty of the master warden of the port of Philadelphia, immediately upon information of the sinking of any canal-boat, barge or other vessel in the channel-way of the tide-waters of the river Delaware or Schuylkill, within the limits of the port of Philadelphia, to give notice to the owner, master or other agent having charge thereof, to raise and remove such obstructions within ten days, under a penalty of one hundred dollars," &c., and that in the case of the failure of the parties notified to remove the obstruction, the master warden shall have it removed at the expense of the owner, master or agent, and that he shall have a lien on the vessel and cargo for all expenses.

This act repeals " all laws inconsistent" with its provisions.

The court (Stroud, J.) directed a nonsuit, which the court in banc, Thayer, J., delivering the opinion, refused to take off.

The plaintiff removed the case to the Supreme Court by writ of error and assigned the judgment of nonsuit for error.

*R. P. White* and *G. H. Earle*, for plaintiffs in error.—They referred to the foregoing Acts of Assembly. The above provision of the Consolidation Act is not repealed, for the section of the Act of 1859 is not inconsistent. The city was bound to keep the navigation clear : Pittsburg *v.* Grier, 10 Harris 54.

*C. H. Gross* and *T. J. Barger*, for defendant in error.—The acts referred to do not impose on the city the duty of keeping the navigation clear, that belongs to the United States : Gibbons *v.* Ogden, 9 Wheat. 1 ; Smith *v.* Turner, 7 How. 283 ; Corfield *v.* Coryell, 4 W. C. C. R. 371 ; The Barque Chusan, 2 Story 455 ; Hammett *v.* Philadelphia, postea 146.

The preamble is not part of a statute ; Dwarris on Statutes 655.

The opinion of the court was delivered May 5th 1871, by

AGNEW, J.—The true question in this case seems not to have been brought to the attention of the learned court below, whose decision appears to have been rested on the effect of the Act of 14th April 1859, Pamph. L. 643. But the case does not fall within the scope of that act. The evidence shows that the obstruction which caused the injury to the plaintiffs' vessel was an abandoned canal coal-barge, which had been wrecked somewhere in the upper waters of the Schuylkill, was brought down by a freshet and lodged

within the port limits of the city of Philadelphia opposite South street wharf. It was also testified that the wreck was of no value, not even fit for firewood, and was claimed by nobody. The persons said to have been the owners were not within reach, and had gone to New York.

The preamble of the Act of 1859 recites "that frequent obstructions to the safe navigation of the Delaware and Schuylkill, within the *tide*-waters, do frequently occur by the *sinking* of canal boats, barges and other vessels *trading* on the said rivers, and there being no adequate remedy to compel the owner, master or other agents having *charge* thereof, to raise and remove the same;" the act then enacts that it shall be the duty of the master warden of the port of Philadelphia, immediately on the information of the *sinking* of any canal-boat, barge, or other vessel in the channelway of the *tide*-waters of the rivers within the *limits* of the *port* of Philadelphia, to give notice to the owner, &c., having *charge* thereof, to raise and remove such obstruction within ten days, under a penalty, &c. In case of the refusal or neglect of the *parties interested*, he is then to raise and remove the boat or vessel at the expense of the owner, master, &c., and the *boat* and *cargo* are made subject to a *lien* for the expense. The master warden is also authorized to *sell all such property* at public sale for *cash*, to pay the expenses, returning the surplus to the owner.

It is very clear these provisions do not apply to the sunken hulk described in the testimony. It was not a trading vessel, or a boat, or barge, capable of use, but an old and worthless wreck, which had drifted off and lodged and became embedded in the mud. It did not sink, within the letter or the spirit of the act, in the tidewater of the Schuylkill and the limits of the port of Philadelphia, but was brought down the river by a freshet. It had no owner, master, or agent having charge of it, but had been abandoned in the upper waters of the river. There were no parties interested; it was not the subject of a lien, and could not be sold at any price, for it was utterly worthless—not fit even for firewood. Those who have noticed the rusty and mud-and-water-soaked timbers and planks of such a sunken hulk, can readily understand how worthless they become. The evident intention of the Act of 1859 was to provide for the raising and removing of trading vessels, that is, those in use—vessels having some value, and having owners or other parties interested in them, who are liable to port regulations and can be reached. But a worthless wreck like this, abandoned by the owner and brought down by a flood, is not only valueless, and without a party interested in it, but the owner is absolutely not liable to raise or remove the hulk. The principle is stated in the 3d vol. Whart. Cr. Law, sec. 2406 (6th edition), where it is said: "But if a ship or other vessel sink by accident in a river, although it obstruct the navigation, yet the owner is

[Winpenny v. Philadelphia.]

not indictable as for a nuisance for not removing it." For this he cites the leading cases of Rex v. Watts, 2 Espinasse Rep. 675; and also R. v. Russell, 9 D. & R. 561; s. c. 6 B. & C. 566; R. v. Ward, 4 Ad. & El. 384; R. v. Tindall, 6 Ad. & El. 143, and R. v. Morris, 1 B. & Ad. 441. In the very recent work of Shearman & Redfield on the Law of Negligence, sec. 583, it is said: " It is well settled that the owner of a vessel which has been sunk in navigable waters, and abandoned by him, is under no obligation to remove the vessel, and is not liable for the injuries it may cause other navigators.". " If, however, instead of abandoning the wreck he retains such possession and control of it, as it is susceptible of, he is bound to exercise an ordinary and reasonable degree of diligence and despatch in removing it, or preventing its doing injury to others." And when he attempts to remove the wreck and fails, the inadequacy of the means will not be proof of negligence. Ibid., and see authorities there cited. And see, also, Angell on Watercourses, 3d ed., p. 211.

There seem to be good reasons for this rule. When a vessel is lost by the act of God, or by accident, the owner suffers oftentimes great damage, and when she becomes a total loss, it seems to be a great hardship to add to his misfortune the duty of removing the wreck. It would discourage commerce to hold him to so severe a duty; for who would engage in trade, if, when he has lost his vessel, he might be forced to incur an expense of more than her original cost in removing the wreck from some difficult position? If compelled by the accident to abandon his property, the duty of removal should rather fall on the public, who are interested in the navigation, than on him.

That this absence of liability on the part of the owner is commonly understood by the people of this state, is evident from the fact that her large rivers are often strewn with the wrecks of vessels, bridges and buildings, carried down by the floods and lodging among the rocks, in the sand, and along the shore, and yet no one thinks of a suit or indictment against the owners for not removing them. I can see no difference between the wrecks of vessels, and the ruins of mills, bridges and houses swept off by a freshet, and lodged in the waters below; yet no indictment or suit for not removing them has been sustained. Indeed, the reverse is stated by Gibson, C. J., in Lehigh Bridge Co. v. Lehigh Coal and Nav. Co., 4 Rawle 24, who says: " When a loss happens exclusively from an act of Providence, it will not be pretended that it ought to be borne by him whose superstructure was made the immediate instrument of it." The same doctrine was held in Roush v. Walter, 10 Watts 86. The owner of this abandoned wreck not being liable to remove it, or for injuries caused by it, the next point is the liability of the city.

Whether at common law it was the duty of cities and towns to

[Winpenny *v.* Philadelphia.]

keep their ports free from obstructions appears (says the learned District Judge) to be a question involved in doubt. He then cites from Hale, *De Portibus Maritimus*, part 2, c. 7; 1 Hawk. P. Cr., c. 32, § 13; Borough of Colchester *v.* Brooke, 7 Ad. & El. N. S. 339, and Williams *v.* Wilcox, 8 Ad. & El. 314, to show that in England it has been held in different ways. The later'cases lean to the doctrine that navigable rivers are not like ordinary highways, and no duty lies on the public to keep them free of obstructions. But whatever may be the law necessary to the safety of commerce in a long-settled, wealthy, and populous country, the circumstances attending the settlement of this state, and the total inability of the people along the navigable streams to keep them free from obstructions, leave no doubt of the law as understood here. I remember no instance of an attempt to compel any county, township or city to maintain the waters fronting upon, or passing through it, in a navigable condition. The case of Pittsburg *v.* Grier, 10 Harris 54, was decided on the special duty of the city growing out of the maintenance of the wharf where the pile of iron lay, and the rents received for its use. As to ordinary highways, see Erie City *v.* Schwingle, 10 Harris 388. The general understanding in this country is, that the clearing out of streams and removing obstructions to navigation belong to the state or the United States, according to the character of the stream, as confined within state limits, or extending beyond and necessary to inter-state commerce. Yet it is not a duty of perfect obligation, but one of voluntary assumption, or imperfect obligation; inasmuch as it cannot be enforced against the will of the state.

The loss of the plaintiff would, therefore, fall upon himself had it happened in any other part of the state. But by the 28th section of the Consolidation Act, passed 2d February 1854, P. L. 21, it is made the duty of the city councils, "after the requisite surveys and soundings thereto have been made, to fix the lines beyond which no wharf or pier shall be constructed, and to keep the navigable waters within said city for ever open and free from obstructions." It is argued this duty is restricted to the space within the wharf lines. But this is opposed to the language of the act referring to the *navigable* waters which are to be kept open and free of obstructions. The *navigable* waters are evidently those outside of the wharf lines. The duty, therefore, is express, and the consequences of negligence rest on the city. What we have already said shows that the case not falling within the scope and intent of the Act of 1859, the duty under the Act of 1854 is not affected by the 2d section of the Act of 1859, repealing all laws inconsistent with the provisions of that act. The court below, therefore, erred in directing a nonsuit.

Judgment of nonsuit reversed, and a *procedendo* awarded.