# WYANDOTTE TRANSPORTATION CO. ET AL. v. UNITED STATES.

No. 31. Argued October 16–17, 1967.—Decided December 4, 1967.

*Lucian Y. Ray* argued the cause for petitioners. With him on the briefs were *Benjamin W. Yancey, George B. Matthews, Tom F. Phillips* and *J. Barbee Winston.*

*Alan S. Rosenthal* argued the cause for the United States. With him on the brief were *Acting Solicitor*

*General Spritzer* and *Acting Assistant Attorney General Eardley.*

*E. D. Vickery, Alexander B. Hawes* and *Scott H. Elder* filed a brief for the American Waterways Operators, Inc., et al., as *amici curiae,* urging reversal.

MR. JUSTICE FORTAS delivered the opinion of the Court.

Two cases, consolidated by the trial court and raising related issues, are here involved. In *United States* v. *Cargill, Inc.,* the Government asked that parties responsible for the allegedly negligent sinking of a vessel in an inland waterway be declared responsible for removing the impediment to navigation thus created. In *United States* v. *Wyandotte Transportation Co.* the United States had itself removed a sunken vessel; claiming that the vessel had been negligently sunk, it sought reimbursement for the costs of removal. The question now before us for decision is whether the relief requested in these cases is available to the United States.

The United States District Court for the Eastern District of Louisiana concluded that such relief is not available. After the cases were consolidated, that court granted summary judgment against the United States in each instance. The court decided that the Government has no *in personam* rights against those responsible for having negligently sunk a vessel. In its view, the United States is limited to an *in rem* right against the cargo of the negligently sunk vessel and against the vessel itself. *United States* v. *Cargill, Inc.,* 1964 A. M. C. 1742.

The Court of Appeals for the Fifth Circuit reversed. It held that under the Rivers and Harbors Act of 1899, 30 Stat. 1151 *et seq.,* as amended, 33 U. S. C. § 401 *et seq.,* the United States may assert *in personam* rights—to injunctive or declaratory relief or damages—against those responsible for the negligent sinking of a vessel. *United*

*States* v. *Cargill, Inc.*, 367 F. 2d 971 (1966). Because of a conflict among the circuits and because of the important question regarding interpretation of a statute of the United States, we granted certiorari. 386 U. S. 906 (1967). We affirm the judgment below.

The crucial facts of both cases occurred in March 1961. The *Cargill* libel alleges that, at that time, a supertanker bound up the Mississippi for Baton Rouge, Louisiana, collided with two barges moored by a tug. The barges were owned by petitioner Cargo Carriers, Inc., and petitioner Jeffersonville Boat and Machine Co., respectively. The Government was notified immediately after the accident that the two barges had sunk. A few days later, it was served with notice that the barges were being abandoned. The United States refused, however, to accept abandonment or to assume responsibility for removing the wrecks. In December 1962, it brought suit against the owners, managers, charterers, and insurers of the two barges, seeking a decree that the respondents were responsible for removing the sunken vessels. The Government charged that negligence in the equipping, manning, and mooring of the barges had caused the sinking. To this date, the barges involved in this case remain in the Mississippi.

The *Wyandotte* libel is founded on facts more dramatic. A barge loaded with 2,200,000 pounds of liquid chlorine sank while being pushed in the Mississippi near Vidalia, Louisiana. Wyandotte, the owner of the barge, at first made some attempts to locate and raise the wreck. But then, in November 1961, Wyandotte informed the Army Corps of Engineers that it believed further efforts to raise the barge would be unsuccessful. Wyandotte stated that it was abandoning the vessel. The Government began a study of the danger posed by such a substantial load of chlorine at the bottom of the Mississippi. It was feared that if any chlorine escaped it would be

in the form of lethal chlorine gas, which might cause a large number of casualties. The Government demanded that Wyandotte remove the barge. Wyandotte refused to do this.[1]

The United States then moved to avert a catastrophe by locating and raising the barge and its deadly cargo. In October 1962, the President proclaimed the presence of the barge to be a major disaster under the Disaster Relief Act, 64 Stat. 1109, 42 U. S. C. §§ 1855–1855g. Safety precautions on a grand scale were taken, and a team of experienced divers sought gingerly to raise Wyandotte's barge. These operations, costing the United States some $3,081,000, proved successful.

The United States demanded that the owners and operators of the barge reimburse the Government for its expenses. This demand was rejected. In January 1963, the Government brought suit, *in rem* against the barge and her cargo,[2] and *in personam* against the owner of the barge, the owner of the boat that had been pushing the barge when it sank, and the owner of the chlorine cargo.[3] The libel charged these parties with negligence

---

[1] There is some dispute as to whether the United States ever agreed to remove the owner's barge. The Court of Appeals was cognizant of this issue but concluded that its resolution of the cases made a decision on this point unnecessary. We agree. We therefore do not pass on the questions whether the United States asserted the right to remove Wyandotte's barge or whether the Government, once it has asserted such a right, is precluded from seeking declaratory relief.

[2] Upon motion of the United States, the District Court ordered that the chlorine and its containers be sold and that the proceeds be paid into court pending final disposition of the litigation. The proceeds of this sale were $85,000. Petitioners do not dispute the right of the United States to this sum. See n. 12, *infra*.

[3] On petition for rehearing, the Court of Appeals affirmed the summary judgment entered in favor of Union Carbide Co., the owner of the chlorine, on the ground that there was no allegation or proof of negligence on its part. That decision is not now before us.

and fault in the design, towing, manning, mooring, and equipping of the barge. The Government sought a decree for the costs it incurred in removing the wreck.[4]

## I.

Although the Government has advanced several discrete grounds for affirmance, we do not pause to examine each of them.[5] We agree that § 15 of the Rivers and

---

[4] Of the expenses incurred by the United States, approximately $1,565,000 was for engineering costs; the remainder, some $1,516,000, was for public health and safety measures, including allegedly necessary precautions against a possible rupture of the chlorine containers during salvage operations. We do not, of course, pass on the questions whether all of these expenses were necessary to remove the barge or whether the Government may recover all of them.

[5] Thus, we intimate no view as to whether a negligently sunk vessel may be an "obstruction . . . to the navigable capacity of any of the waters of the United States," prohibited by § 10 of the Rivers and Harbors Act of 1899, 33 U. S. C. § 403. This was the ground upon which the Court of Appeals rested its decision. We do not assess any of the Court of Appeals' conclusions, nor do we decide whether petitioners may be subject to the criminal and other remedies of § 12 of the Act, 33 U. S. C. § 406, which applies to violations of § 10.

Nor, finally, do we decide whether nonstatutory public nuisance law may form a basis for the relief here sought by the Government. See, e. g., *Mayor of Georgetown* v. *Alexandria Canal Co.,* 12 Pet. 91, 97 (1838); *United States* v. *Hall,* 63 F. 472, 474 (C. A. 1st Cir. 1894); *The Ella,* [1915] P. 111 (1914); Comment, Substantive and Remedial Problems in Preventing Interferences with Navigation: The *Republic Steel Case,* 59 Col. L. Rev. 1065, 1067 (1959); Wisdom, Obstructions in Rivers, 119 Just. P. 846 (1955). We therefore do not pass either on the question whether such a nonstatutory right of the sovereign has ever existed in the United States, cf. *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1, 8 (1888); *United States* v. *Republic Steel Corp.,* 362 U. S. 482, 486 (1960); or on whether such a right, if it ever did exist, survived the series of enactments beginning with the Rivers and Harbors Act of 1890, 26 Stat. 426, 454, in which Congress asserted the general interest of the United States in the removal of sunken vessels obstructing navigable waters. Cf. *In re Debs,* 158 U. S. 564 (1895).

Harbors Act of 1899, 33 U. S. C. § 409, read in light of our decision in *United States* v. *Republic Steel Corp.,* 362 U. S. 482 (1960), controls the issues here presented. Section 15 reads in relevant part as follows:

"It shall not be lawful . . . to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels . . . . And whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411–416, 418, and 502 of this title." 33 U. S. C. § 409.

Petitioners do not dispute, as indeed they could not, that the negligent sinking of a vessel falls within the prohibition of the first above-quoted clause of § 15.[6] They contend, however, that the Act contains specific remedies for such a violation of § 15, and that those remedies were meant by Congress to be exclusive of all

---

[6] It bears emphasis that we are here concerned with the *careless or negligent* sinking of a vessel, which is specifically declared not to be lawful by the first above-quoted clause of § 15. Negligence is the sole theory of recovery in the Government's libels. Questions involving a non-negligent sinking, which is not forbidden by § 15, are not now before us and we do not mean to indicate what relief, if any, may be available to the Government in that situation.

others. Petitioners point to the § 15 duty of the owner to mark and remove a sunken craft. They note that failure to remove "shall be considered as an abandonment of such craft, and subject the same to removal by the United States." And petitioners call our attention to §§ 19 and 20 of the Act, 33 U. S. C. §§ 414–415, which set forth the procedure whereby the United States may remove a sunken craft that "shall be considered as" abandoned under § 15. Section 19 provides that whenever a sunken vessel exists as an obstruction to any navigable waters of the United States for a period longer than 30 days, or whenever the abandonment of such obstruction can be legally established in a shorter time, the sunken vessel "shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army at his discretion, without liability for any damage to the owners of the same." That section further contemplates "[t]hat any money received from the sale of any such wreck . . . shall be covered into the Treasury of the United States." 33 U. S. C. § 414. Section 20, an emergency provision applicable only when a sunken vessel obstructs a waterway "in such manner as to stop, seriously interfere with, or specially endanger navigation," 33 U. S. C. § 415, is similar in structure to § 19.[7]

Finally, petitioners emphasize that § 16 of the Act provides criminal penalties for "[e]very person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the pro-

---

[7] The determination of the applicability of § 20 is left by that section to "the opinion of the Secretary of the Army, or any agent of the United States to whom the Secretary may delegate proper authority." Once the determination is made, the Secretary or his agent may "take immediate possession" of a sunken vessel "so far as to remove or to destroy it and to clear immediately" the obstructed waterway. See n. 20, *infra*.

visions [of § 15]." 33 U. S. C. § 411.[8] They point out
that § 12 of the Act, 33 U. S. C. § 406, which provides
penalties for violations of § 10, 33 U. S. C. § 403,[9] ex-
pressly authorizes the injunctive remedy. They argue
that the lack of such an authorization in § 16 should be
taken to mean that Congress did not intend the United
States to be able to obtain what is, in effect, injunctive
relief as a remedy for a violation of § 15.[10]

The position of petitioners is, therefore, that in the
case of a negligently sunk vessel, the Government may
require the owner to mark it; it may expect him to
remove it or forfeit his interest in the vessel; and if the
Government proceeds to remove the vessel, it possesses
the right to sell vessel and cargo and retain the proceeds
of these sales.[11] Moreover, the Government may pro-
ceed criminally, under § 16, against those responsible for
the negligent sinking. But, petitioners argue, the Gov-
ernment may do no more. Under their view, the very
detail of the Rivers and Harbors Act negates the possi-
bility that Congress intended the Government to be

---

[8] Violation is a misdemeanor, punishable by "a fine not exceeding
$2,500 nor less than $500, or by imprisonment (in the case of a
natural person) for not less than thirty days nor more than one
year, or by both such fine and imprisonment, in the discretion of
the court . . . ."

[9] See n. 5, *supra*.

[10] As noted, the United States sought declaratory relief in the
*Cargill* action.

[11] The Government notes, in regard to petitioners' contention that
these remedies are exclusive, that they apply only to the owner
of a vessel. The Government argues that the position of those
allegedly negligent petitioners who are not owners is substantially
weaker. But see *United States* v. *Bethlehem Steel Corp.*, 319 F.
2d 512, 521 (C. A. 9th Cir. 1963). We note that the prohibition
of § 15 against the negligent sinking of a vessel and the criminal
penalties of § 16 are not limited to owners. Our disposition of these
cases makes it unnecessary for us to pass on the Government's
contention.

able to recover removal expenses exceeding the value of the vessel and its cargo. Petitioners would apply the same analysis to a government action for declaratory or injunctive relief. Indeed, petitioners believe that authorization of the injunction remedy in another, analogous, section of the Act indicates congressional intent to withhold declaratory or injunctive relief as a means of enforcing § 15.[12]

We do not agree. Petitioners' interpretation of the Rivers and Harbors Act of 1899 would ascribe to Congress an intent at variance with the purpose of that statute. Petitioners' proposal is, moreover, in disharmony with our own prior construction of the Act, with our decisions on analogous issues of statutory construction, and with a major maritime statute of the United States. If there were no other reasonable interpretation of the statute, or if petitioners could adduce some persuasive indication that their interpretation accords with the congressional intent, we might be more disposed to accept that interpretation. But our reading of the Act does not lead us to the conclusion that Congress must have intended the statutory remedies and procedures to be exclusive of all others. There is no indication anywhere else—in the legislative history of the Act, in the predecessor statutes, or in nonstatutory law—that Congress might have intended that a party who negligently sinks a vessel should be shielded from personal responsibility. We therefore hold that the remedies and procedures specified by the Act for the

---

[12] Petitioners concede the *in rem* right of the United States against a negligently sunk vessel and its cargo, see Brief for Petitioners, p. 12, despite the fact that the right of the Government to proceed against cargo is by no means clearly granted by the statute. See § 19, 33 U. S. C. § 414; *United States* v. *Cargo Salvage Corp.*, 228 F. Supp. 145 (D. C. S. D. N. Y. 1964). See also § 16, 33 U. S. C. § 412.

enforcement of § 15 were not intended to be exclusive. Applying the principles of our decision in *Republic Steel*, we conclude that other remedies, including those here sought, are available to the Government.

## II.

Article I, § 8, of the Constitution grants to Congress the power to regulate commerce. For the exercise of this power, the navigable waters of the United States are to be deemed the "public property of the nation, and subject to all the requisite legislation by Congress." *Gilman* v. *Philadelphia,* 3 Wall. 713, 725 (1866). The Federal Government is charged with ensuring that navigable waterways, like any other routes of commerce over which it has assumed control, remain free of obstruction. Cf. *In re Debs,* 158 U. S. 564, 586 (1895). The Rivers and Harbors Act of 1899, an assertion of the sovereign power of the United States, *Sanitary District* v. *United States,* 266 U. S. 405 (1925), was obviously intended to prevent obstructions in the Nation's waterways. Despite some difficulties with the wording of the Act, we have consistently found its coverage to be broad. See, *e. g., Sanitary District* v. *United States, supra; United States* v. *Republic Steel Corp.,* 362 U. S. 482 (1960).[13] And we have found that a principal beneficiary of the Act, if not the principal beneficiary, is the Government itself. *United States* v. *Republic Steel Corp., supra,* at 492.

Our decisions have established, too, the general rule that the United States may sue to protect its interests. *Cotton* v. *United States,* 11 How. 229 (1851); *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273 (1888); *Sanitary District* v. *United States, supra.* This rule is not

---

[13] In this conclusion we have been supported by similarly broad readings of similar statutes predating this one. See, *e. g., United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690 (1899).

necessarily inapplicable when the particular governmental interest sought to be protected is expressed in a statute carrying criminal penalties for its violation. *United States* v. *Republic Steel Corp., supra.* Our decisions in cases involving civil actions of private parties based on the violation of a penal statute so indicate. *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33 (1916); *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964).[14] In those cases we concluded that criminal liability was inadequate to ensure the full effectiveness of the statute which Congress had intended. Because the interest of the plaintiffs in those cases fell within the class that the statute was intended to protect, and because the harm that had occurred was of the type that the statute was intended to forestall, we held that civil actions were proper. That conclusion was in accordance with a general rule of the law of torts. See Restatement (Second) of Torts § 286. We see no reason to distinguish the Government, and to deprive the United States of the benefit of that rule.

The inadequacy of the criminal penalties explicitly provided by § 16 of the Rivers and Harbors Act is beyond dispute. That section contains only meager monetary penalties. In many cases, as here, the combination of these fines and the Government's *in rem* rights would not serve to reimburse the United States for removal expenses. It is true that § 16 also provides for prison terms, but this punishment is hardly a satisfactory remedy for the pecuniary injury which the negligent shipowner may inflict upon the sovereign. Cf. *United States* v. *Acme Process Equipment Co.,* 385 U. S. 138 (1966).

It was a similar process of reasoning that underlay our decision in *United States* v. *Republic Steel Corp.,* 362

---

[14] See *North Bloomfield Gravel Min. Co.* v. *United States,* 88 F. 664, 678–679 (C. A. 9th Cir. 1898). See also *Dann* v. *Studebaker-Packard Corp.,* 288 F. 2d 201, 208–209 (C. A. 6th Cir. 1961); *Reitmeister* v. *Reitmeister,* 162 F. 2d 691, 694 (C. A. 2d Cir. 1947).

U. S. 482 (1960). That case concerned the deposit of industrial solids which, we believed, created an "obstruction . . . to the navigable capacity" of a waterway of the United States, within the meaning of § 10 of the Act. We decided that the Government might seek injunctive relief to compel removal of such an obstruction, even though such relief was nowhere specifically authorized in the Act. We concluded that the authorization of injunctive relief in § 12, which is applicable only to a limited category of § 10 obstructions (structures), should not be read to exclude injunctions to compel removal of other types of § 10 obstructions. In referring to the Act, we noted that "Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation." 362 U. S., at 492.

Although we do not approach the instant cases in the context of § 10, we believe the principles of *Republic Steel* apply, by analogy, to the issues now before us.[15]

---

[15] Petitioners would distinguish *Republic Steel* on the ground that, in that case, "if . . . injunctive relief . . . was not available, the free navigability of the channel would be seriously impaired and Republic Steel Corp., by repeatedly paying the fine imposed [by § 12], would, in effect, be operating under a license." See Brief for Petitioners, p. 29; *United States* v. *Bethlehem Steel Corp.*, 319 F. 2d 512, 518 (C. A. 9th Cir. 1963). This ground of distinction will not do, for at least three reasons. First, the criminal provisions of § 12 include not only a fine but a prison term. See *United States* v. *Bethlehem Steel Corp.*, 319 F. 2d 512, 523 (C. A. 9th Cir. 1963) (dissenting opinion). Second, if fines were in practice the only deterrent in § 12 and § 16, it might well be worthwhile to risk fines rather than take necessary safety measures for tows. Third, the proposed ground of distinction concentrates upon the injunction in *Republic Steel* against future violations of the Act; it does not explain the mandatory injunction in that case to compel removal of the obstruc-

The Government may, in our view, seek an order that a negligent party is responsible for rectifying the wrong done to maritime commerce by a § 15 violation. Denial of such a remedy to the United States would permit the result, extraordinary in our jurisprudence, of a wrongdoer shifting responsibility for the consequences of his negligence onto his victim. It might in some cases permit the negligent party to benefit from commission of a criminal act. We do not believe that Congress intended to withhold from the Government a remedy that ensures the full effectiveness of the Act. We think we correctly divine the congressional intent in inferring the availability of that remedy from the prohibition of § 15.

It is but a small step from declaratory relief to a civil action for the Government's expenses incurred in removing a negligently sunk vessel. See *United States* v. *Perma Paving Co.,* 332 F. 2d 754 (C. A. 2d Cir. 1964). Having properly chosen to remove such a vessel, the United States should not lose the right to place responsibility for removal upon those who negligently sank the vessel. See Restatement of Restitution § 115; *United States* v. *Moran Towing & Transportation Co.,* 374 F. 2d 656, 667 (C. A. 4th Cir. 1967). No issue regarding the propriety of the Government's removal of Wyandotte's barge is now raised. Indeed, the facts surrounding that sinking constitute a classic case in which rapid removal by someone was essential. Wyandotte was unwilling to effectuate removal itself. It would be surprising if Congress intended that, in such a situation, the Government's

tion that had already been created at the time of the Government's suit.

Indeed, the argument for exclusivity was stronger in *Republic Steel* than it is here. In that case, we decided that injunctive relief was a proper enforcement measure against a violation of the very section to which § 12 (but not the statutory provision of injunctive process) applies.

commendable performance of Wyandotte's duty must be at Government expense. Indeed, in any case in which the Act provides a right of removal in the United States, the exercise of that right should not relieve negligent parties of the responsibility for removal. Otherwise, the Government would be subject to a financial penalty for the correct performance of its duty to prevent impediments in inland waterways.[16] See *United States* v. *Perma Paving Co., supra,* at 758.

We note, moreover, that under the Limitation of Shipowners' Liability Act of 1851, 9 Stat. 635, as amended, 46 U. S. C. § 181 *et seq.,* the liability of a shipowner "for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture" may be limited to "the interest of such owner in such vessel, and her freight then pending"; but this limitation is available only if the act or damage occurred "without the privity or knowledge of such owner." 46 U. S. C. § 183. "For his own fault, neglect and contracts the owner remains liable." *American Car & Foundry Co.* v. *Brassert,* 289 U. S. 261, 264 (1933). The reading that petitioners would place on the Rivers and Harbors Act of 1899 would create an additional right of limitation, applicable in the special case of a sinking even though the owner is himself negligent. Yet Congress gave no indication, in passing the Rivers and Harbors Act, that it intended to alter or qualify the 1851 Act.[17] In the congressional failure to

---

[16] Wyandotte, noting that Government funds spent in removal operations were provided under the Disaster Relief Act, 42 U. S. C. §§ 1855–1855g, argues that nothing in that Act authorizes the United States to recover disaster relief expenditures from private parties. We agree, but the argument misses the point. We believe the United States may recover its expenses under the Rivers and Harbors Act of 1899. We see nothing in the Disaster Relief Act to the contrary.

[17] We do not, of course, pass on the applicability of the Limitation Act, before or after passage of the Rivers and Harbors Act, to the

connect these two statutes, we find at least some evidence that petitioners' discovery of a limitation of liability in the Rivers and Harbors Act is unwarranted.[18]

## III.

Petitioners contend that, despite our prior decisions and the silence of the Rivers and Harbors Act on this point, that statute authorizes them simply to abandon their negligently sunk vessels, without further responsibility for those vessels. We find in the Act no support for such an absolute right of abandonment. The provision upon which petitioners place most reliance, the final clause of § 15, creates a "duty of the owner of [a] sunken craft to commence the immediate removal of the same, and prosecute such removal diligently." Because "failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections [19 and 20]," petitioners contend that such failure in no case has other consequences. But the duty imposed by and the remedy provided in the final clause of § 15 and §§ 19 and 20 are not prescribed only for owners of negligently sunk ves-

facts of the case now before us. We only note that the principle for which petitioners are contending is very much like the principle of limitation of liability, known to the statutory maritime law of the United States almost 50 years prior to passage of the Rivers and Harbors Act.

[18] Petitioners' theory is, moreover, in conflict with the administrative interpretation of the statute. A regulation promulgated by the Department of the Army provides that "a person who . . . negligently permits a vessel to sink in navigable waters of the United States . . . may . . . be compelled to remove the wreck as a public nuisance or to pay for its removal." 33 CFR § 209.410. The origins of this regulation go back to 1901. Letter from William Cary Sanger, Acting Secretary of War, to William L. Hughes, July 31, 1901. See *United States* v. *Republic Steel Corp.*, 362 U. S. 482, 490, n. 5 (1960).

sels. Those provisions apply "whenever a vessel . . . is wrecked and sunk in a navigable channel, accidentally or otherwise . . . ." Unlike a negligent sinking, a non-negligent sinking is not declared by the Act to be unlawful. It seems highly unlikely that Congress, having specified that only a negligent or intentional sinking is a crime, would then employ such indirect language to grant the culpable owner a personal civil immunity from the consequences of that crime.

We believe the sections noted by petitioners are intended to protect the United States against liability for removing a sunken vessel if it chooses to do so. See *Zubik* v. *United States,* 190 F. 2d 278 (C. A. 3d Cir. 1951); *Gulf Coast Transp. Co.* v. *Ruddock-Orleans Cypress Co.,* 17 F. 2d 858 (D. C. E. D. La. 1927). Section 19 speaks explicitly of the discretion of the Secretary of the Army to break up, remove, sell, or otherwise dispose of a sunken vessel that has obstructed a waterway "without liability for any damage to the owners of the same." These sections do not negate the rights of the United States to obtain declaratory relief or to recover removal expenses. It is true that a proviso to § 19 states "[t]hat any money received from the sale of any such wreck . . . shall be covered into the Treasury of the United States." But that proviso does not indicate that the United States, having chosen to remove a sunken vessel, shall receive no other monies. At most, the proviso establishes the proposition that, if the United States chooses to sell a wreck, the owner of the vessel has no right to any monies received.[19] Section 20, the emergency

---

[19] This rule is not unfair. See 41 Tulane L. Rev. 459, 464, n. 29 (1967). The shipowner should know the value of his vessel and cargo. If he believes that value is greater than the cost of removal, he may, within 30 days after the obstruction is created, raise the vessel himself. See § 19, 33 U. S. C. § 414.

section, closely parallels § 19. It adds nothing to petitioners' argument.[20]

Petitioners also claim that a substantial body of nonstatutory law establishes the rule that a shipowner who has negligently sunk a vessel may abandon it and be insulated from all but *in rem* liability.[21] They argue that Congress must have intended to codify this rule in the Rivers and Harbors Act. We do not accept petitioners' claim. Although several modern courts have

---

[20] Thus, § 20 concludes with the proviso "[t]hat the expense of removing any such obstruction as aforesaid shall be a charge against such craft and cargo; and if the owners thereof fail or refuse to reimburse the United States for such expense within thirty days after notification, then the officer or agent aforesaid may sell the craft or cargo, or any part thereof that may not have been destroyed in removal, and the proceeds of such sale shall be covered into the Treasury of the United States." Petitioners rely heavily on the phrase "shall be a charge against such craft and cargo." But that phrase does not lead to the conclusion that the Government possesses no other right to recover. The phrase merely describes the lien interest of the United States. See *United States* v. *Moran Towing & Transportation Co.*, 374 F. 2d 656, 671 (C. A. 4th Cir. 1967) (dissenting opinion). Such a provision is necessary in a § 20 case because, under the terms of that section, the owner is not given a statutory period in which to decide whether the value of his vessel and cargo exceeds the cost of removal and to effectuate removal himself.

[21] Petitioners do not appear to claim that the legislative history of the Rivers and Harbors Act of 1899 clearly indicates the intent of Congress to create or codify this rule. To the extent that any intent appears in the legislative history of the 1899 Act, it is the intent not to alter pre-existing statutory law. Thus, the House conferees said of the statute that it was a "codification of existing laws pertaining to rivers and harbors, though containing no essential changes in the existing law." 32 Cong. Rec. 2923 (1899); see *United States* v. *Republic Steel Corp.*, 362 U. S., at 486. The legislative history of prior statutes is scant. And the prior Acts themselves lend no support to petitioners. See Rivers and Harbors Act of 1880, 21 Stat. 180; Rivers and Harbors Act of 1882, 22 Stat. 191; Rivers and Harbors Act of 1890, 26 Stat. 426.

assumed the existence of such a common-law rule, see, e. g., *United States* v. *Moran Towing & Transportation Co.*, 374 F. 2d 656, 667 (C. A. 4th Cir. 1967); *United States* v. *Bethlehem Steel Corp.*, 319 F. 2d 512, 518–519 (C. A. 9th Cir. 1963), the rule evaporates upon close analysis.[22] We do not believe Congress intended the Rivers and Harbors Act to embody this illusory nonstatutory law.

---

[22] The American decisions speaking of a nonstatutory right of abandonment all trace back to a dictum in *Winpenny & Chedester* v. *Philadelphia,* 65 Pa. 135 (1870). See, *e. g., The Manhattan,* 10 F. Supp. 45 (D. C. E. D. Pa. 1935); *Gulf Coast Transp. Co.* v. *Ruddock-Orleans Cypress Co.,* 17 F. 2d 858 (D. C. E. D. La. 1927). In *Winpenny* the Pennsylvania Supreme Court stated in dictum that the "owner [of a sunken vessel] is absolutely not liable to raise or remove the hulk." 65 Pa., at 138. For this proposition, the Pennsylvania court cited three treatises and five English cases. The cases are not good authority. The only one close to the point, *King* v. *Watts,* 2 Esp. 675, 170 Eng. Rep. 493 (1798), held that an indictment for having sunk a vessel in the Thames could not be maintained because the owner had not been negligent and "it would be adding to the calamity to subject the party to an indictment . . . against which he could not guard, or which he could not prevent." Of the two treatises cited, one, Shearman & Redfield on Negligence (3d ed. 1869), states at § 583 that "[i]t is well settled that the owner of a vessel which has been sunk in navigable waters, and abandoned by him, is under no obligation to remove the vessel . . . ." But the only case cited for this "well-settled" rule is *King* v. *Watts.*

Moreover, it seems clear that the *Winpenny* court was not speaking of the "rule" that petitioners propose. That court, after the above quoted passage, went on as follows:

"There seem to be good reasons for this rule. When a vessel is lost by the act of God, or by accident, the owner suffers oftentimes great damage, and when she becomes a total loss, it seems to be a great hardship to add to his misfortune the duty of removing the wreck. It would discourage commerce to hold him to so severe a duty; for who would engage in trade, if, when he has lost his vessel, he might be forced to incur an expense of more than her original cost in removing the wreck from some difficult position? If compelled by the accident to abandon his property, the duty of

## IV.

These cases were decided in the District Court on petitioners' motions for summary judgment. The Court of Appeals reversed and remanded for further proceedings. As we have noted, the Government's libels were based on a theory of negligence, and the award of the Court of Appeals called for a determination whether the acts of the various petitioners constituted negligence. We agree with that disposition.

*Affirmed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring.

I concur in the Court's holding that under § 15 of the Rivers and Harbors Act of 1899, 33 U. S. C. § 409, the United States may recover the costs of removing a vessel negligently sunk in navigable waters from those responsible for the sinking. I further agree with the holding that the United States is entitled to the declaratory relief sought in the *Cargill* action. In affording this latter relief it is my understanding that the Court does not purport to decide whether the United States may also obtain an injunction compelling removal, but has

removal should rather fall on the public, who are interested in the navigation, than on him."

Cases cited for petitioners that do not rely on *Winpenny* either do not support petitioners' claim of a nonstatutory rule, see, *e. g., In re Highland Nav. Corp.,* 24 F. 2d 582 (D. C. S. D. N. Y. 1927), affirmed, 29 F. 2d 37 (C. A. 2d Cir. 1928); *Zubik* v. *United States,* 190 F. 2d 278 (C. A. 3d Cir. 1951); *United States* v. *Bridgeport Towing Line, Inc.,* 15 F. 2d 240 (D. C. D. Conn. 1926), or support it only with unsupported dicta of their own, see, *e. g., Barraclough* v. *Brown,* [1897] A. C. 615 (construing the Aire and Calder Navigation Act, 1889 (52 & 53 Vict., c. 32)).

left that question to be answered in light of a full development of the facts, and in accordance with normal standards of equity.

In reaching these conclusions, I have not been unmindful of the view stated by me in dictum in my dissenting opinion in *United States* v. *Republic Steel Corp.*, 362 U. S. 482, 493, to the effect that the courts are precluded from supplying relief not expressly found in the Rivers and Harbors Act. Insofar as that dictum might be taken to encompass the present case, where, contrary to my view in *Republic Steel*, I do believe that the relief afforded by this Court is fairly to be implied from the statute, candor would compel me to say that the dictum was ill-founded.

On these premises I join the opinion of the Court.