FILED
United States Court of Appeals
Tenth Circuit

April 9, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

JANTRAN, INC.,

Defendant - Appellee.

No. 13-7060

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. 6:11-CV-00250-RAW)**

---

Steve Frank, Appellate Staff (Stuart F. Delery, Principal Assistant Attorney
General, Mark F. Green, United States Attorney, and Leonard Schaitman,
Appellate Staff, with him on the briefs), United States Department of Justice,
Washington, DC, for Appellant.

Philip S. Brooks, Jr. (Ronald J. Kitto with him on the brief), Montgomery Barnett,
L.L.P., New Orleans, LA, for Appellee.

---

Before **TYMKOVICH**, **EBEL**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

The Miss Dixie is a cargo line boat operated by Jantran, a company

involved in maritime transportation on the Verdigris River in Oklahoma. While

operating on the river, the Miss Dixie struck and extensively damaged a lock maintained by the Army Corps of Engineers. After repairing the lock, the Corps sued Jantran for the costs of repair.

One would think such a suit would be a routine matter, but because of the federal maritime legal regime at play, we are required to revisit basic principles of civil procedure involving *in personam* and *in rem* jurisdiction. For purposes of this case, if federal law allows an *in personam* action against Jantran as ship owner and operator, the company will be personally liable for all of the Corps's damages in repairing the lock. But if federal law only allows an *in rem* action against the damage-causing vessel, the Corps would be limited to seeking damages capped at the value of the Miss Dixie.

The district court dismissed the Corps's suit, concluding that federal law does not allow the Corps to seek *in personam* damages directly from the owners of a vessel that damages a structure on navigable waters. As the court found, the applicable statute, the Rivers and Harbors Act, 33 U.S.C. §§ 401–27, only allows *in rem* claims against the vessel that caused the damage—here the Miss Dixie.

We agree with the district court that the Act does not authorize *in personam* actions against the owners of the vessel. The Act only allows the Corps to proceed *in rem* against the vessel itself. We therefore AFFIRM.

# I. Analysis

While carrying cargo, the Miss Dixie lost power, struck, and damaged a lock operated by the Army Corps of Engineers. The United States then commenced in district court an *in personam* civil action against Jantran under § 408 of the Rivers and Harbors Act.

The Rivers and Harbors Act was enacted in 1899, and in large part is designed to establish a national legal framework that would help regulate harm to the nation's waterways. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201 (1967). To this end, the Act prohibits conduct that might damage or obstruct river structures like dams, locks, or levees. In particular, § 408 makes it unlawful for any person to damage a federal water-control structure, stating that:

> It shall not be lawful for any person or persons to . . . alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any seawall, bulkhead, jetty, dike, levy, wharf, pier or other work built by the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods . . . .

33 U.S.C. § 408. A related provision, § 409, establishes that it "shall not be lawful . . . to sink, or permit or cause to be sunk, vessels or other craft in navigable channels." *Id.* § 409. Section 409 further provides that, in the event of a violation, "it *shall be the duty* of the owner, lessee, or operator of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently." *Id.* (emphasis added).

Nothing in the Rivers and Harbors Act, however, expressly authorizes the government to bring an action against a ship owner or operator to enforce these provisions. Rather, the Act provides two kinds of remedies for violations of § 408. First, § 411 authorizes criminal fines and penalties for "[e]very person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, 409, 414, and 415."[1] *Id.* § 411.

Second, § 412 provides that the government may proceed *in rem* against any vessel used to violate the Rivers and Harbors Act:

> [A]ny boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, 409, 414, and 415 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof.

---

[1] In larger part, "Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, 409, 414, and 415 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of up to $25,000 per day, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment . . . ." 33 U.S.C. § 411.

*Id.* § 412. In sum, § 408 prohibits damaging or obstructing a federal water-control structure, while sections 411 and 412 provide criminal and civil *in rem* actions, respectively.

Nonetheless, the Corps argues that § 408 should be read to also authorize *in personam* actions. Although it concedes that the text of § 408 does not expressly establish an *in personam* remedy, the Corps contends the Supreme Court has already construed the similarly worded § 409 as allowing precisely that type of relief. Section 409 of the Act states that, "It shall not be lawful to . . . sink or permit or cause to be sunk, vessels or other craft in navigable waters." *Id.* § 409. Despite the lack of any reference in the statute to *in personam* relief, the Supreme Court held in *Wyandotte* that § 409 impliedly authorizes a personal right of action against ship owners to further a purpose of full compensation for maritime damages. *See* 389 U.S. 191. The Corps argues that without an implied personal right of action, § 408, like § 409, is inadequate to fully compensate the United States for its losses. As a matter of consistency, the Corps contends § 408 must therefore contain an implied right to *in personam* relief for the same reasons.

We disagree, but our analysis first requires a brief detour through basic civil procedure. The differences between *in rem* and *in personam* actions have a number of practical consequences. First, in contrast to a traditional *in personam*

action where the defendant is typically a person or business,[2] the defendant in an *in rem* action under the Act is the vessel itself.[3] This follows from traditional maritime law, where a party injured by a maritime vessel automatically obtains a lien on that vessel at the time of the accident. 2 *Benedict on Admiralty* § 21 (7th ed. 1987) ("The principle is that one . . . who, through the instrumentality of the ship, has suffered a wrong that is within the maritime jurisdiction, shall have by way of security or redress, an enforceable interest in the ship."). Under maritime law, after the creation of the lien the injured party can then bring an *in rem* action against the vessel itself and foreclose its lien if successful in the action. *Id.* This process highlights the second unique feature of *in rem* actions: *in rem* recoveries are necessarily limited to the value of the vessel itself.

Why would the statute express a preference for *in rem* actions? Although perhaps unusual for inland torts, the Act's apparent preference for *in rem* over *in personam* proceedings is in line with the principles and practices of maritime law. Maritime law has long recognized that "a ship is, of necessity, a wanderer," which "visits shores where her owners are neither known nor accessible." 2 *Benedict on Admiralty* § 21. Accidents happen, and with maritime vessels

---

[2] "(Of a legal action) brought against a person rather than property." *Black's Law Dictionary* 862 (9th ed. 2009).

[3] "Involving or determining the status of a thing, and therefore the rights of persons generally with respect to that thing." *Black's Law Dictionary* 862 (9th ed. 2009).

accidents often happen far from home. Frequently the negligent party will be a ship captain of insufficient means to satisfy a judgment, and the responsible ship owner may be a foreign entity difficult to sue and unlikely to satisfy a judgment. Thus, maritime law historically recognized an aggrieved party might find his "best and surest pledge for . . . compensation and indemnity" in the ship itself and, as a result, traditional maritime law grants an injured party a lien in the vessel that caused his injury. *Id.* §§ 21–22. The injured party can then foreclose his lien and receive compensation by filing an *in rem* action against the ship itself. *Id.* § 21.[4]

In another case, our finding that § 408 expressly provides an *in rem* action might be the end of the story. But the Supreme Court complicated the analysis in *Wyandotte*.

Despite a lack of an express *in personam* remedy in the Rivers and Harbors Act, the Supreme Court found in *Wyandotte* that the Act impliedly authorizes injunctive relief and *in personam* damages actions for violations of § 409. 389 U.S. at 200. There, the petitioners abandoned three vessels that had sunk on the Mississippi. Because two of those vessels were obstructing the waterway, while the third was at risk of leaking highly toxic chemicals into the

---

[4] This case presents a slight wrinkle since Jantran sold the Miss Dixie after the accident. But that fact is of no importance. Maritime liens "follow the ship into the hands of anyone in whose possession she may come, including an innocent purchaser." *Id.* § 22.

river, the United States sought an injunction requiring the owners of the first two vessels to remove them and initiated the emergency removal of the third. *Id.* at 194–195. As part of its suit, the United States also sought reimbursement for the costs it incurred in removing the third vessel. *Id.* at 196.

Construing language in § 409 that imposed "a duty o[n] the owner, lessee, or operator of such sunken craft to commence the immediate removal of the same," 33 U.S.C. § 409, the Court found the statute created an implied right to injunctive relief, *Wyandotte*, 389 U.S. at 203–04. The Court observed that the purpose of the Act was to "prevent obstructions in the Nation's waterways" and the criminal and *in rem* remedies given in the Act were inadequate to effectuate this purpose. *Id.* at 201. Without an injunctive remedy the United States could not enforce the ship owners' "duty" to remove obstructions, and the costs of removal to the United States would have been significantly greater than the value of the offending ships. To deny injunctive relief would have allowed the ship owner to avoid his duty and thus "shift[] responsibility for the consequences of his negligence onto his victim" by forcing the United States itself to remove the ships. *Id.* at 204.

Finding the availability of injunctive relief to enforce a ship owner's duty to remove his wrecked vessel, the Court went on to hold that it was "but a small step from declaratory relief to a civil action for the Government's expenses incurred in removing a negligently sunk vessel." *Id.* at 204. The Court thus

found that § 409 also must impliedly authorize *in personam* actions because "[i]t would be surprising if Congress intended that . . . the Government's commendable performance of Wyandotte's duty must be at Government expense." *Id.* at 204–05.

Although sections 408 and 409 are different, the government nonetheless argues that because the language and purposes of the two provisions are similar, they should be interpreted to authorize similar remedies. The government points out that § 408, which, like § 409, begins by declaring that "It shall not be lawful" to engage in certain prohibited conduct (namely, damaging a federal water-control structure). *See* 33 U.S.C. § 408. From this broad language, the government argues *Wyandotte*'s policy of full compensation controls and we should conclude that the criminal and *in rem* penalties provided for in the Rivers and Harbors Act are inadequate to compensate the United States for its losses.

The parties observe that *Wyandotte* has led to a split in the circuits over the proper interpretation of § 408. In a 1977 case, *Hines, Inc. v. United States*, 551 F.2d 717 (6th Cir. 1977), the Sixth Circuit allowed an *in personam* recovery against a ship owner under § 408. In that case, the government sought to recover for damage that occurred when two barges struck a federal dam, caught fire, and sank. At issue was whether the Limitation of Liability Act of 1851, which limits damages in maritime accidents to the value of the offending vessel, *see* 46 U.S.C. § 183, restricts the damages available under § 408.

We do not find *Hines* persuasive. First, it is far from clear that the Sixth Circuit even addressed the question of whether § 408 authorizes *in personam* relief. Rather, the court seems to have assumed that such relief was available and instead focused on the conflict between the two statutes at issue. Second, even assuming that the Sixth Circuit did decide the question, its opinion contains limited textual analysis and thus is of limited persuasive value.

More recently, in *Barnacle Marine Management Inc. v. United States*, 233 F.3d 865, 870 (5th Cir. 2000), the Fifth Circuit addressed the very issue we face in this appeal. Relying on the plain language of the Act, the court found that § 408 did not authorize *in personam* actions. *Id.* Specifically, the court found that the Supreme Court's decision in *Wyandotte* was not controlling, because "the *Wyandotte* Court expressly relied on language peculiar to § 409" that "create[s] a *duty* on the owner of the sunken vessel to remove it." *Id.* (emphasis added). The court explained that it was the unique, duty-creating language of § 409 that caused the Supreme Court to find that the section contained an implied right to injunctive relief, and that it was the right to injunctive relief that justified finding an implied *in personam* action in § 409. *See id.* ("The Court stated that '[i]t is but a small step from declaratory relief to a civil action . . . .'" (quoting *Wyandotte*, 389 U.S. at 204)). Because § 408 does not, by its terms, create any duties, the Fifth Circuit found that *Wyandotte* was not applicable. *Id.* The Fifth Circuit also correctly observed that the Supreme Court has in recent years

-10-

avoided creating implied rights of action, concluding lower courts "should be reluctant to imply a remedy broader than Congress expressly provided." *Id.* (citing *Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 532–33 (1989); *California v. Sierra Club*, 451 U.S. 287 (1981); *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979)).

We find this analysis persuasive. In our view, *Wyandotte* is best read as relying on the unique, duty-creating language of § 409. Section 409's creation of a duty to remove sunken vessels was of obvious relevance to the Court's finding that the government could obtain an order directing ship owners to remove those same sunken vessels and, as the Court stated, "[i]t is but a small step from declaratory relief to a civil action." *Wyandotte*, 389 U.S. at 204. The Court further highlighted the importance of § 409's duty-creating language to its *in personam* holding by noting that "[i]t would be surprising if Congress intended that . . . the Government's commendable performance of Wyandotte's *duty* must be at Government expense." *Id.* at 204–05 (emphasis added).

In response, the government argues that Congress did not intend for the lack of a statutory duty under § 408 to imply that it authorizes fewer remedies than does § 409. Rather, the absence of duty language in § 408 merely reflects the undesirability of having private parties repair government locks and dams. Although this may explain why § 408 does not contain an independent duty, this observation does not affect our analysis. The simple fact is that § 409 *does*

contain an explicit duty, and that duty was key to finding an implied right to injunctive relief in *Wyandotte*. Because § 408 contains no such duty, there is no textual hook from which to infer that Congress intended for § 408 to authorize *in personam* relief.

We also reject the government's contention that sections 408 and 409 should be read to authorize the same remedies simply because they both begin, "It shall be unlawful to . . . ." *See* 33 U.S.C. §§ 408, 409. Such a reading would require us to ignore the subsequent, relevant differences in the statutes and base our analysis on what is, essentially, a boilerplate introduction. As a result, we find that our analysis is not bound by the Supreme Court's decision in *Wyandotte* and rely on the text of the Rivers and Harbors Act.

The structure and text of the Act provide additional clues. The Act contains two remedy sections—sections 411 and 412—and one would not ordinarily expect a non-remedial section, such as § 408, to authorize broader remedies by implication than those already expressly provided. In fact, the Supreme Court has repeatedly observed that, "It is . . . an 'elemental canon' of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies. In such cases, in the absence of strong indicia of contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered

appropriate." *Karahalios*, 489 U.S. at 532–33; *see also, e.g.*, *Sierra Club*, 451 U.S. 287.

Despite this guidance, the government contends we should decline to apply the presumption against implied remedies in interpreting the Rivers and Harbors Act because the implied remedies would be in favor of the United States and not private parties.

We are not persuaded. First, the government has not advanced any argument explaining why we should favor inferring public remedies over private ones. Nonetheless, our analysis likely would not change even if the government had presented a clear policy argument for preferring public remedies. The proposition that courts ought to be reluctant to find implied remedies where an act expressly provides other remedies is, in essence, a variation of the negative implication, or *expressio unius*, canon, which holds that "the expression of one thing implies the exclusion of others." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). This canon is based on "how people express themselves and understand verbal expression." *Id.* It guides us to the most principled interpretation of the text itself—it is not merely a policy-based rule of thumb that can be set aside because of countervailing policy concerns. Given this, we reject the argument that the negative implication canon only applies when private remedies are at issue. *See also United States v. City of Philadelphia*, 644 F.2d 187, 191–92 (3d Cir. 1980) ("We reject the

argument that *Wyandotte* established a different standard for inferring rights of action in favor of the government than the standard applicable to private litigants.").

This conclusion, however, does not end our analysis. As noted above, the Supreme Court has held a court still may infer an omitted remedy when there are "strong indicia of contrary congressional intent." *See Karahalios*, 489 U.S. at 532–33. To this end, the government asserts that Congress could not have intended that the only civil recoveries under § 408 be *in rem* against the offending ship as it is possible to violate § 408 without using a ship at all. As the government correctly asserts, § 408 begins by stating that "[i]t shall not be lawful for *any person* or persons to . . . *in any manner whatever* impair the usefulness" of any federal water control structure. 33 U.S.C. § 408 (emphasis added). It is thus possible to violate § 408 without using a ship by, for instance, standing on top of a protected structure and striking it with a sledgehammer.

Although this argument might have merit, the government fails to demonstrate that it would, in fact, be limited to *in rem* relief in such cases. If someone did decide to take a sledgehammer to a federal dam, we can find no reason why the United States could not sue outside of the Rivers and Harbors Act and recover on a negligence or trespass theory. The government has not pointed to any other language in the Act that demonstrates a congressional intent to

provide for an *in personam* remedy in lieu of other civil remedies available to the Corps.

Because nothing in the text of the Rivers and Harbors Act indicates a congressional intent to allow for an implied cause of action against Jantran, we are compelled to find no other remedies are available. We thus hold that the government may not bring *in personam* actions against vessel owners for violations of § 408 of the Act.

## II. Conclusion

The District Court's Order dismissing the action is AFFIRMED.