UNITED STATES of America, Plaintiff,

v.

OHIO BARGE LINE, INC., in personam, and M/V Steel Forwarder, her engines, tackle, appurtenances, etc., in rem, Defendants.

Civ. A. No. 75–783.

United States District Court,
W. D. Pennsylvania.

Sept. 27, 1978.

Patrick A. Fayle, U. S. Dept. of Justice, Admiralty & Shipping Section, Washington, D. C., Henry Barr, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff, U. S. A.

Wayne L. Emery, Richard J. Munsch, Pittsburgh, Pa., for defendants.

## OPINION

ROSENBERG, District Judge.

The plaintiff, the United States of America, brought this admiralty claim against

the defendant, Ohio Barge Line, Inc. (hereinafter called "OBL"), *in personam*, and against the defendant, M/V Steel Forwarder (hereinafter called "Forwarder"), *in rem*, pursuant to both the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq., specifically §§ 403 and 409 thereof, and the Federal common law of nuisance. This court has jurisdiction of this action under Title 28 U.S.C. § 1345. Damages are sought for $16,345.00, an amount which represents the cost incurred by the plaintiff for the hiring of a helper boat, the M/V Jeffery Lynn, for certain periods during July and August, 1972. The Jeffery Lynn was hired after the defendant had sunk three barges in what was then referred to as Uniontown Pass in the Ohio River.

The Ohio River is one of the nation's navigable rivers over which commercial traffic regularly operates. Lock and Dam 49, until its destruction after 1972, was located at Mile 845 on the Ohio River. The lock was on the left descending bank of the river, the Kentucky shore. On the opposite shore was the State of Indiana. The dam at Lock 49 was a "wicket-type" which could be submerged during high or "open" river conditions. At such times vessel traffic ordinarily did not lock at Lock 49 but navigated directly over the dam through a navigable pass which was approximately 900 feet wide. When the dam at Lock 49 was in the raised position, the flow of water past the dam was controlled by the operation of a number of movable wickets and two "beartraps". The beartraps were located on the Indiana side of the river.

A "beartrap" is a dam component constructed in two sections or leaves which are hinged at their lower ends and placed between two concrete piers. Among other things, its purpose is to rapidly lower the upper pool and to pass floating debris and ice. A "wicket" on the other hand, is a heavy timbered shutter which is pivoted on a line-like steel frame. This in turn is pivoted on the dam's concrete foundation to restrain the wicket from lateral movement.

Uniontown Lock and Dam is located on the Ohio River at Mile 846 approximately 3.5 miles downstream from Uniontown, Kentucky. The dam portion was designed to replace Dams 48 and 49. At this time, permanent locks had been constructed along the Indiana bank, and a cofferdam and fixed weir section of the dam had been constructed near the Kentucky bank, leaving an open river pass, or chute, between the cofferdam and the locks. Traffic was afforded the option of locking through Uniontown or of navigating through the pass.

The main lock chamber of Uniontown is 110 feet wide and 1200 feet long. There is also an auxiliary lock which is 110 feet wide and 600 feet long. Uniontown dam as constructed was approximately one mile downstream from the dam at Lock 49. The distance from the downstream lockwall of Lock 49 to the upstream lockwall of Uniontown lock was approximately 3500 feet.

In contemplation of the building of Uniontown lock and dam, the Corps of Army Engineers in 1963 authorized model tests to be made of the existing and anticipated river and navigational conditions at the Uniontown site before, during and after construction. That study concluded that during the period of time that Uniontown was under construction, while the dam at Lock 49 had not yet been removed, the river between those structures would be dominated by an eddy created by the flow of water coursing through the beartraps. They similarly concluded that such an eddy was likely to produce an impediment to navigation.

By June of 1972 the first stage cofferdam and low weir section of the Uniontown Dam had been completed leaving a 500 foot wide navigable pass between the cofferdam and the outer lock wall of the Uniontown lock. The operation of the beartraps at Dam 49 continued to create a large eddy below the dam. In addition, the construction of the Uniontown cofferdam and low weir section had created a navigable "head", i. e., a difference in elevation of the water above and below the pass.

The amount of "head" at the pass varied depending upon the intensity of the flow in the Ohio River. Thus, the "head" was higher during periods of strong current and

high river and less during periods of low water conditions when Dam 49 was raised. When the dam at Lock 49 was lowered and open river conditions existed, the current in the pass at Uniontown approached 6 to 8 miles per hour and the current between Lock 49 and Uniontown was approximately 1 mile per hour. If, however, the dam at Lock 49 was raised and the beartraps were not running, the current between Lock 49 and Uniontown was negligible. Further complicating navigation was the predisposition of the Ohio River to shift and change its sandbars and shoals very rapidly.

In June, 1972 the Forwarder and its tow of barges moved up river. The Forwarder is a 5000 horsepower towboat, 168 feet long by 40 feet wide. On June 26 and 27, the master of the Forwarder was Stanley Roll. The pilot was Charles Young and the mate was Leon Lyle. Young was an experienced Ohio River pilot who held a license issued by the Coast Guard and endorsed by it for the Ohio River. At approximately 12:00 a. m., E.S.T., the watch changed and pilot Young received the helm of the Forwarder from Captain Bell. At that time, the vessel was approximately nine miles below the Uniontown Lock and had in tow 17 iron ore laden barges, 15 of which were ahead of the Forwarder (3 barges wide and 5 barges long) and 2 of which were lashed to the side. Each of the barges measured 35 feet by 195 feet. The total length of the flotilla was approximately 1070 feet and the width was approximately 105 feet.

Every six hours at each change of the watch, the Forwarder's officers and crew checked the vessel and its tow. In checking the tow, they opened the hatches on the barges to determine that the voids had not filled with water. They assured themselves that the tow was trim, that the lashings were secure and that the signal lights were in proper working order.

After receiving the helm from Captain Roll at approximately 1:00 a. m., the local time at Uniontown, Mr. Young and the

Forwarder proceeded upstream until, approximately three-quarters of a mile below Uniontown, they were required to maneuver to the Indiana shore to permit a downbound vessel to pass. After the southbound tow had yielded sufficient channel, the Forwarder, its searchlights on ahead of it, commenced its final approach towards the Uniontown pass. When he left the Indiana shore, pilot Young brought the Forwarder to full throttle as he approached the head at the pass. When the flotilla was approximately 600 feet from the Uniontown cofferdam, the three lead barges, OBL35, 62 and 92, suddenly dove beneath the water and sank, approximately 300 to 400 feet out from the Uniontown lockwall.

The sinking of the three barges in the Uniontown pass on June 27, 1972 in no way was contributed to or caused by any actions of the United States or any of its agents. The sinking was solely caused by the actions, negligence or otherwise, of the defendant in the circumstances as they existed at the time and place. After the three barges had sunk the Coast Guard was informed and as a result the Coast Guard Cutter Lantana was dispatched to the scene, arriving at noon on June 27th. The Lantana marked the position of the barges.

On July 8, 1972, the Coast Guard was notified that the buoy marker which the cutter Lantana had placed on the water above the barges on June 27 had disappeared and that the barges appeared to have shifted. The Lantana was again dispatched and arrived at Uniontown on July 9. It found that one of the barges, subsequently identified as OBL35, had shifted and was then approximately 200 feet from the Uniontown lower lockwall. At that time, responsible and authorized officials of the United States Army Corps of Engineers decided that these three sunken barges constituted an obstruction to navigation through the Uniontown pass, and thereupon closed[1] the pass to vessel traffic until the

1. The remaining portion of the river channel was not physically closed, even though it may have been so inferred from the "Local Notice to Mariners", the first of which was dated June 27, 1972, and which stated, inter alia, "Barges appear to be piled together, one barge stacked

last barge was raised. These three barges remained within the navigable channel of Uniontown pass from the time they sank until they were removed. Two of the three barges, OBL62 and 92, were raised from approximately the same position in which they had sunk. The actions of the United States in closing the pass and keeping it closed until all the barges were removed was reasonable under the circumstances.

During the periods of July 25 to August 3, 1972, and August 10 to August 20, 1972, Dam 49 was raised. The raising of Dam 49, together with the closure of the pass, required vessel traffic in both directions to proceed from Uniontown lock on one side of the river and Lock 49 on the other side of the river. Because of the navigational hazards created between Lock 49 and Uniontown by the three sunken barges, the Corps determined sometime after the Uniontown pass was closed to hire a helper boat to safeguard the life and property of all who used the Ohio River, including the United States. The Corps reasonably determined that the services of a helper boat would be needed based on the fact that the pass had been closed and the knowledge that vessels crossing between Uniontown Lock and Lock 49 would be subjected to strong currents, crosscurrents and eddies.

After soliciting bids for a helper boat, the Corps contracted for the use of the M/V Jeffery Lynn. The contract provided that the Corps pay $35.00 per hour for each hour the Jeffery Lynn devoted to the job of providing towing assistance between Uniontown and Lock 49 and that such hourly charge was to commence when the Jeffery Lynn departed its home port of Mt. Vernon, Indiana, and ceased when it arrived back at Mount Vernon. The Jeffery Lynn was hired for those periods when the pass was closed due to the obstruction to navigation posed by the sunken barges and when vessels had to lock through both Uniontown and Lock 49. The Jeffery Lynn was to assist only those vessels which requested assistance. Specification 40 of the dam construction contract did not obligate the contractor to provide helper boat service provided by the Jeffery Lynn.

The contract for services entered into between the Corps of Engineers and the Jeffery Lynn was fair and reasonable under the circumstances. The reasonable value of the Jeffery Lynn's services during the periods between July 25 to August 3, 1972 and August 10 to August 20, 1972, was $16,345.00, that is, 467 hours of service at $35.00 per hour. OBL35 was raised on July 30, 1972. OBL62 was raised on August 17, 1972. OBL92 was finally raised August 19, 1972.

Section 10 of the Rivers and Harbors Act of 1899, 30 Stat. 1121, 1151, as amended, 33 U.S.C. § 403 [2], provides in part as follows:

"That the creation of *any obstruction* not affirmatively authorized by Congress, *to the navigable capacity* of any of the water of the United States is hereby prohibited; . . ." (Emphasis supplied).

on another. The navigational channel has been closed and mariners are to lock through Uniontown Locks. Extreme caution advised." Subsequent notices related to the sunken barges and one dated July 3, 1972, related to unlighted red buoys and stated, inter alia, "Buoys warn all mariners of danger in the channel. All mariners are to lock through Uniontown Locks. Extreme caution advised." (Tr. pgs. 155 and 156).

2. Section 10 of the R&HA, 33 U.S.C. § 403 reads in full as follows: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, *or of the channel of any navigable water of the United States,* unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same." (Emphasis supplied).

■ Decisional law construing this statute instructs that this provision be read "charitably in light of the purpose to be served (i. e., protection of the navigable capacity of waters of the United States)," which "forbids a narrow, cramped reading" of the section. *United States v. Republic Steel Corp.,* 362 U.S. 482, 491, 80 S.Ct. 884, 890, 4 L.Ed.2d 903 (1960). In fact, § 403 expressly states that any obstruction, regardless of how it is caused, is prohibited. It is clear therefore that the mere creation of an obstruction, negligently or otherwise, to the navigable capacity of any body of water gives rise to liability under this section.

■ Section 401 et seq., is an assertion of the sovereign power of the United States, *Sanitary District v. United States,* 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925), over the navigable waters of the nation, *United States v. Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 63, 33 S.Ct. 667, 672, 57 L.Ed. 1063 (1913) and "subject to all the requisite legislation by Congress", *Gilman v. Philadelphia,* 70 U.S. (3 Wall) 713, 725, 18 L.Ed. 96 (1866); *United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329.(1967). The "great design of this legislation", *United States v. Republic Steel Corp., supra,* 362 U.S. at page 492, 80 S.Ct. 884, includes the obligation "to maintain and promote the safety of navigation", *Atlantic Refining Co. v. Moller,* 320 U.S. 462, 466, 64 S.Ct. 225, 227, 88 L.Ed. 168 (1943).

■ As observed by Mr. Justice Holmes in *New Jersey v. New York,* 283 U.S. 336, 342, 51 S.Ct. 478, 479, 75 L.Ed. 1104 (1931), "a river is more than an amenity, it is a treasure." For this reason the Supreme Court has consistently interpreted the Act broadly to fully effectuate its purposes. (See, e. g. *Sanitary District v. United States, supra; United States v. Republic Steel Corp., supra,* 362 U.S. at page 490, 80 S.Ct. 884; *United States v. Standard Oil Co.,* 384 U.S. 224, 226, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966); *Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *United States v. Pennsylvania Industrial Chem. Corp.,* 411

U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). This broad interpretation in favor of the United States is mandated not only by the laudatory purpose of the Act, but also by the fact that "a principal beneficiary of the Act if not the principal beneficiary, is the Government itself." *Wyandotte Transp. Co. v. United States, supra,* 389 U.S. at page 201, 88 S.Ct. at page 386.

Indeed this court has previously had reason to interpret the first clause of § 403. In earlier proceedings on this same cause of action, I found that a barge, whether negligently or intentionally sunk in a navigable river of the United States, is an obstruction within the meaning of 33 U.S.C. § 403. *United States v. Ohio Barge Lines, Inc.,* 432 F.Supp. 1023 (W.D.Pa.1977).

Although this particular issue has already been resolved, the defendants raise two others by the application of § 403 to this case: (1) did the sunken barges diminish the navigable capacity of the river and thus constitute an actionable obstruction, and (2) is the cost of helper boat service properly cognizable as a removal expense?

■ The defendants' contention that the three sunken barges did not constitute an "obstruction" to navigation because they did not diminish the navigable capacity of the river is without merit since the evidence shows that all the barges were within the 500 foot wide navigable channel located at the Uniontown Pass. The defendants' argument that traffic continued to navigate through the pass after it was closed is irrelevant. The reasonableness of the Coast Guard's determination that a real obstruction to navigation existed is not in any manner repudiated simply because certain mariners acted contrary to Coast Guard instructions. In fact, the evidence shows that after sinking the barges bobbed up and down. One of the barges (OBL35) even shifted its position considerably and caused damage to the Coast Guard cutter Lantana as she was attempting to locate the positions of the sunken barges.

■ The evidence is ample to establish a reasonable basis for the Coast Guard's deci-

sion to close the pass and the Corps' decision to retain a helper boat. In light of its knowledge of the sunken barges within the channel itself, the Coast Guard would have been derelict in its responsibility to maritime traffic to permit vessels to use the Pass. The Corps of Engineers had previously (without sunken barge obstruction) made the determination that whenever the Uniontown Pass would be closed due to construction on the Uniontown Dam, and vessels would have to lock through at both Uniontown Lock and Lock 49, a helper boat should be provided to assist requesting vessels in the making of this transit. This decision was based on the Corps' knowledge of the velocities and flow of the currents, crosscurrents and eddies in the area. It had been made months, if not years, prior to this occurrence. See e. g., Technical Report H–15–9, Navigation Condition at Uniontown Locks and Dam, Ohio River. This determination was one which Congress delegated to the Corps to make because it is the agency which has both responsibility over and expertise in the protection of the navigable waterways of the nation. The expertise of the agency concerned is a cogent factor in analyzing the reasonableness of any of its action. *Alton R. Co. v. United States,* 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586 (1942).

The term "navigable capacity" has been judicially defined as the capability of being navigated over any part of waters when in their normal condition. *Hubbard v. Fort,* 188 F. 987 (3 Cir.). The law is clear as to the broad sweep of § 403, and definitive authority is supplied from the landmark interpretation of this statute in *Republic Steel, supra,* 362 U.S. at pages 487 and 488, 80 S.Ct. at page 888,

> "There is an argument that § 10 of the 1890 Act, 26 Stat. 454, which was the predecessor of the section with which we are now concerned, used the words 'any obstruction' in the narrow sense, embracing only the prior enumeration of obstructions in the preceding sections of the Act. The argument is a labored one which we do not stop to refute step by step. It is unnecessary to do so, for the

Court in *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 708 [19 S.Ct. 770, 777, 43 L.Ed. 1136], decided not long after the 1899 Act became effective, gave the concept of 'obstruction', as used in § 10, a broad sweep: 'It is not a prohibition of any obstruction to the navigation, but any obstruction to the navigable capacity, and anything, wherever done or however done, within the limits of the jurisdiction of the United States, which tends to destroy the navigable capacity of one of the navigable waters of the United States, is within the terms of the prohibition.' This broad construction given § 10 of the 1890 Act was carried over to § 10 of the 1899 Act in *Sanitary District v. United States,* 266 U.S. 405, 429 [45 S.Ct. 176, 69 L.Ed. 352], the Court citing *United States v. Rio Grande Dam & Irrigation Co., supra,* with approval and saying that § 10 of the 1899 Act was 'a broad expression of policy in unmistakable terms, advancing upon' § 10 of the 1890 Act."

And at page 489, 80 S.Ct. at page 889,

> "The teaching of those cases is that the term 'obstruction' as used in § 10 is broad enough to include diminution of the navigable capacity of a waterway by means not included in the second or third clauses. In the *Sanitary District* case it was caused by lowering the water level. Here it is caused by clogging the channel with deposits of inorganic solids. Each affected the navigable 'capacity' of the river. The concept of 'obstruction' which was broad enough to include the former seems to us plainly adequate to include the latter."

■ As for the claim of damages the defendant argues that the Government was not required to hire a helper boat service because it was unnecessary and because the cost of the helper boat service was not related to the removal of an obstruction. In the alternative, the defendant argues that damages must be restricted to the cost of that portion of the helper boat service which was provided to vessels already committed to the waterway at the time of

sinking. However, these positions are not supported by law. The helper boat was an insurance device against harm to navigation which might have been caused prospectively after the barges had sunk and caused a partial obstruction in a channel which was part of an already dangerous passageway resulting from existing surface and depth currents, crosscurrents and eddies. And as previously noted in *Wyandotte, supra,* and *Republic Steel, supra,* the principal beneficiary of the River and Harbors Act of 1899 is the federal sovereign. The United States is the principal beneficiary by virtue of Article 1, § 8 of the Constitution, the Commerce Clause, which confers upon the United States a "dominant servitude" with respect to navigation. *Federal Power Commission v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 249, 74 S.Ct. 487, 98 L.Ed. 686 (1954).

As a principal beneficiary of the Act the federal government is entitled to seek appropriate relief in the courts. In *Wyandotte, supra,* it was stated 389 U.S. at pages 201–202, 88 S.Ct. at page 386:

"Our decisions have established, too, the general rule that the United States may sue to protect its interests. *Cotton v. United States,* 11 How. 229 [13 L.Ed. 675] (1851); *United States v. San Jacinto Tin Co.,* 125 U.S. 273 [8 S.Ct. 850, 31 L.Ed. 747] (1888); *Sanitary District v. United States, supra.* This rule is not necessarily inapplicable when the particular governmental interest sought to be protected is expressed in a statute carrying criminal penalties for its violation. *United States v. Republic Steel Corp., supra.* Our decisions in cases involving civil actions of private parties based on the violation of a penal statute so indicate. *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33 [36 S.Ct. 482, 60 L.Ed. 874] (1916); *J. I. Case Co. v. Borak,* 377 U.S. 426 [84 S.Ct. 1555, 12 L.Ed.2d 423] (1964). In those cases we concluded that criminal liability was inadequate to ensure the full effectiveness of the statute which Congress had intended. Because the interest of the plaintiffs in those cases fell within the class that the statute was intended to protect, and be-

cause the harm that had occurred was of the type that the statute was intended to forestall, we held that civil actions were proper. That conclusion was in accordance with a general rule of the law of torts. See Restatement (Second) of Torts § 826. We see no reason to distinguish the Government, and to deprive the United States of the benefit of that rule."

■ *Republic Steel, supra,* determined that one who creates an obstruction under § 10 (33 U.S.C. § 403) is liable to the United States for costs of removal, and the government is not limited to the recourse of an abatement injunction pursuant to § 406. *Wyandotte, supra,* held that remedies and procedures for enforcement of § 15 (33 U.S.C. § 409) are not exclusive, and do not foreclose *in personam* relief against a party who negligently sinks a vessel in navigable waters. Although the Supreme Court in *Wyandotte, supra,* refused to define the costs recoverable for § 15 (33 U.S.C. § 409), violations, certainly nothing in the law of damages would limit a cause of action solely to the cost of pulling the barges out of the river and exclude reasonable and necessary expenditures "for public health and safety measures", *Wyandotte, supra,* 389 U.S. at page 196, fn. 4, 88 S.Ct. at page 383, between sinking and ultimate removal. The cost of the protective device in providing a helper boat was reasonable and for this the plaintiff is entitled to reimbursement.

The relief to which the government is entitled is the "remedy that ensures the full effectiveness of the Act", *Wyandotte, supra,* at page 204, 88 S.Ct. at page 387. *Republic Steel, supra,* 362 U.S. at page 492, 80 S.Ct. at page 890 speaks even more to the point,

"The test was whether the United States had an interest to protect or defend. Section 10 of the present Act defines the interest of the United States which the injunction serves. Protection of the water level of the Great Lakes through injunctive relief. *Sanitary District Co. of Chicago v. United States, supra,* is precedent enough for ordering that the naviga-

ble capacity of the Calumet River be restored. The void which was left by *Willamette Iron Bridge Co. v. Hatch,* supra, 125 U.S. 1 [8 S.Ct. 811, 31 L.Ed. 629], need not be filled by detailed codes which provide for every contingency. Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation."

Both *Republic Steel, supra,* and *Wyandotte, supra,* have enunciated broad principles with direct application to the facts at hand, namely, that relief permitted should be commensurate with whatever is necessary to enforce the provisions of the Act. It matters not at all that certain measures of relief were not specifically enumerated by Congress in the Act, since these remedies are not exclusive. They are implied from the very purpose and language of the Act, as well as the congruent duties and responsibilities of the Corps of Engineers and the Coast Guard. Helper boat service was determined by the appropriate reviewing authority to be a reasonable and necessary undertaking—to protect not only maritime traffic using the waterway, but as well the government's substantial investment in dam and lock construction.

Accordingly, the defendants, having caused an obstruction to the navigable capacity of a waterway of the United States within the meaning of § 403, are liable for the government's costs incurred in hiring the helper boat, the Jeffery Lynn, as an expense directly related to the cost of removal, in the sum of $16,345.00.

I find a lack of precautionary measures and concern on the part of the defendant's employees in negotiating this long and awkward tow through a passage which the defendant knew or should have known of hazardous currents and eddies.

As for the defendant's charge that the government contributed to the defendant's own negligence in the sinking of the barges, it is totally without merit. The government had a construction job to do, and gave ample and wide notice to all navigation. The government could do no more than this. Alternative passage was provided through the Uniontown Lock but the defendant chose to disregard this for a passage through a channel known by all who plied the river to be hazardous. There is nothing in the evidence of this case which shows that the government acted contrary to what the law required of it under the circumstances.

The Findings of Fact and Conclusions of Law are incorporated in this opinion in accordance with Federal Rule of Civil Procedure 52.