796 F.2d 685
 UNITED STATES of America
v.
OHIO BARGE LINES, INC., in personam and M/V STEEL FORWARDER,
her engines tackle, appurtenances, etc., in rem, Appellants,
v.
John DOE, Richard Roe, ABC Inc. and XYZ Co., in personam and
the Vessels, Tackle and Appurtenances, Jane Doe
and Mary Roe, in rem, Third-Party Defendants.
 No. 85-3155.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 18, 1986.
Decided July 21, 1986.
 
 1
 Wayne J. Emery, Richard J. Munsch (Argued), Rafael Caminero, Pittsburgh, Pa., for appellants.
 
 
 2
 J. Alan Johnson, U.S. Atty., Constance M. Bowden (Argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellee.
 
 
 3
 Before WEIS and SLOVITER, Circuit Judges, and POLLAK, District Judge*
 
 OPINION OF THE COURT
 
 4
 LOUIS H. POLLAK, District Judge.
 
 
 5
 This is a suit in admiralty brought by appellee United States against appellant Ohio Barge Lines (OBL) and, in rem, against OBL's tow boat, M/V STEEL FORWARDER, which is no longer an active party to this litigation. Suit was commenced in 1975. In 1978, the district court entered judgment in favor of the United States in the demanded sum of $15,680 plus interest. 458 F.Supp. 1086 (W.D.Pa.1978). In 1979, this court reversed, remanding the case for further proceedings. 607 F.2d 624 (3d Cir.1979). In 1981, the district court filed a further opinion, again entering judgment in favor of the United States for $15,680 plus interest. OBL's post-trial motions were denied in 1982, but by a clerical error the court's order was not entered until 1985. Thereupon this appeal followed. This time we affirm the judgment below.
 
 I.
 
 6
 Clarification of the questions presented on this second appeal will be aided by a somewhat extended reprise of the prior history of this litigation.
 
 
 7
 The object of this suit was to seek reimbursement for $15,680 in expenditures incurred by the Corps of Engineers in 1972 as a result of the sinking in the Ohio River, just below the Uniontown lock and dam,[1] of three barges being towed upstream by M/V STEEL FORWARDER, a vessel owned and operated by OBL. The expenditures in question were for a month's hire of a "helper boat." The function of the helper boat was to assist river craft in avoiding certain navigation hazards just above the Uniontown lock and dam--hazards caused by the closing of the Uniontown "pass" until the sunken barges were removed from the channel below the pass.
 
 
 8
 The United States grounded its claim on sections 10 and 15 of the Rivers and Harbors Act of 1899. Section 10 (33 U.S.C. Sec. 403) prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States...." A violation of section 10 is a misdemeanor. 33 U.S.C. Sec. 406. Section 15 declares it "not ... lawful ... to voluntarily or carelessly sink ... vessels or other craft in navigable channels.... And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise ... it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States...." 33 U.S.C. Sec. 409.
 
 
 9
 Writing for this court in 1979, Judge Van Dusen summarized compendiously and with characteristic precision the evidence before the court below and the conclusions of law drawn by that court (607 F.2d at 626-27):
 
 
 10
 The evidence showed that the Ohio River is one of the nation's navigable rivers maintained by the Corps of Engineers. Until their removal sometime after 1972, lock and dam 49 were aids to navigation at mile 845 on the Ohio River. The dam was submersible and the lock was on the right ascending shore of the river, the Kentucky side. The dam was normally submerged during high water conditions so that traffic would not have to go through lock 49. When the dam was raised, water was permitted to pass through openings on the Indiana side of the dam, called beartraps.
 
 
 11
 The Uniontown lock and dam, which were designed to replace dam 49, are navigational aids at mile 846 on the Ohio River. In 1972, the lock had been completed and the dam was under construction. The Uniontown lock was on the left ascending shore, the Indiana side, and during the summer of 1972 the dam was being constructed within a cofferdam which extended from the middle of the river toward the Kentucky side. This left a 500-foot opening (the pass) between the cofferdam and the outer wall of the Uniontown lock, which was open to navigation. The Uniontown dam was approximately one mile below the 49 dam, and the distance from the downstream lock wall of lock 49 to the upstream lock wall of the Uniontown lock was approximately 3500 feet. When required to use both locks, tows would have to cross the full width of the river in this short distance.
 
 
 12
 The water conditions created by these structures were hazardous. When dam 49 was raised and the beartraps were open, a counter-clockwise eddy dominated the pool between the two dams. This eddy swept directly across the upstream entrance to the Uniontown lock, making entry and exit from that lock difficult for long tows, which could be swept out of control when crossing the current. When dam 49 was submerged, this eddy did not exist. Regardless of the position of dam 49, a substantial head of water was created at the Uniontown pass by the narrowing of the channel produced by the cofferdam. The water level was often a foot-and-a-half higher immediately above the cofferdam than immediately below. Despite this head of water, it was customary for tows to go through the pass, rather than the Uniontown lock.
 
 
 13
 On the night of June 26-27, 1972, the Forwarder was approaching the Uniontown dam heading upstream. The Forwarder is a 5000 horsepower towboat, 168 feet long and 40 feet wide, owned and operated by OBL. At this time the master of the Forwarder was Stanley Roll and the pilot was Charles Young. The Forwarder was pushing 17 barges laden with ore, 15 ahead (3 wide and 5 long) and one lashed to each side. This made the tow 1070 feet long and 105 feet wide.
 
 
 14
 At midnight the watch changed and pilot Young received the helm. All barges were inspected and found to be in good order. At this time the tow was nine miles below the Uniontown dam. The tow moved upstream until it was required to move out of the main channel, approximately three-quarters of a mile below the Uniontown lock, and stand out of the current waiting for a vessel coming downstream to negotiate the pass. Once the other vessel was below it, the Forwarder headed back into the main channel at full throttle with its search lights on. This throttle setting is customary when taking a tow from a full stop into a swift current, because it gives the tow sufficient maneuverability to maintain control in the current. However, when going through exceptionally rough water, such a throttle setting is dangerous, as excessive speed in such conditions can cause barges to dive under the water and sink. Pilot Young testified that he planned to throttle back shortly before the bow of the tow reached the pass so as to safely negotiate the head of water, but that while the bow was still 600 feet below the pass, the front three barges dove into the water and sank. All three barges were owned by OBL.
 
 
 15
 The Coast Guard was immediately informed, and the next day it placed a marker on the sunken barges, which was approximately 300 feet from the Uniontown lock wall. At this time the pass remained open to navigation. However, on July 8, 1972, the Coast Guard was notified that its buoy had disappeared and that the barges had apparently shifted. One of the barges had in fact shifted to within 200 feet of the Uniontown lock wall. The Coast Guard determined that the narrowness of the channel between that barge and the wall, and the possibility that the barges would shift again, required closing the pass to all navigation until all of the barges had been removed. The pass, accordingly, was officially closed to navigation until August 19, 1972, when the salvor hired by OBL completed the removal.
 
 
 16
 After the pass was closed, all vessels were required to use the Uniontown lock. The Corps of Engineers determined that a helper boat was needed to help tows maneuver in and out of the upstream entrance of the Uniontown lock when dam 49 was raised and the beartraps were open. The helper boat assisted tows through the cross-currents and eddies and thereby protected the tows, the Uniontown lock wall, the cofferdam, and OBL's salvage operation. During the time the pass was closed, dam 49 was raised from July 25 until August 3 and from August 10 until August 20. The Corps contracted with Mt. Vernon Barge Cleaning, Inc. for the use of a helper boat, the M/V Jeffery Lynn, during those periods.
 
 
 17
 When OBL refused to reimburse the Corps for this expense, this suit was filed. In the district court, the Government contended that the defendants were liable for the cost of the helper boat on a theory of strict liability under either Sec. 10 or Sec. 15 and, in the alternative, that the defendants were liable on a negligence theory under either Sec. 10 or Sec. 15. The district court adopted the Government's interpretation of Sec. 10 and held the defendants liable on a theory of strict liability under Sec. 10. Also, the court apparently concluded that the defendants were negligent.
 
 
 18
 On appeal, this court disapproved the district court's principal legal conclusions:
 
 
 19
 First, this court rejected the proposition that section 10 of the Rivers and Harbors Act, which imposes criminal liability on any person or entity responsible for "the creation of any obstruction" to the navigability "of any of the waters of the United States," should also be read as impliedly imposing civil liability to the United States for the sinking of a vessel in a navigable waterway. As Judge Van Dusen showed, the sinking of a vessel in a navigable waterway is expressly dealt with in section 15 of the Act. To read into section 10 a civil cause of action for damages caused the United States by such sinking would render section 15 nugatory.
 
 
 20
 This court then turned to the question of how capacious a civil remedy was to be read into section 15. This court noted, as had the district court, that the Supreme Court had held in Wyandotte Transp. Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), that section 15 would support an implied civil cause of action in favor of the United States for expenses incurred in the removal of negligently sunken vessels.[2] This court determined, however, that the district court erred in extending the Wyandotte principle to impose strict liability, without regard to negligence. Finally, this court concluded that the district court's apparent attribution to OBL of negligence was unsupported by adequately particularized factual findings. Accordingly, this court remanded the case to the district court for further findings.
 
 
 21
 On remand, the district court reaffirmed its judgment of $15,680 plus interest in favor of the United States. Accompanying the judgment was a lengthy opinion clarifying the factual bases for the judgment. The paragraphs which follow are the district court's distillation of its findings:
 
 
 22
 I find that the helper boat cost was a protective removal expense recoverable as damages under the Act, in order to protect the public health and safety from the dangers involved in the hazardous river crossing between the two sets of locks, because of the defendant's negligent sinking of the three barges in the river below the channel until the removal of three sunken barges was made.
 
 
 23
 * * *
 
 
 24
 * * *
 
 
 25
 With the closing of the river and channel by the defendant's sinking of the barges and the consequential navigational hazards, the Corps of Engineers determined, as it had the discretionary power to do, that a helper boat should be made available to traffic when needed. This help was especially needed by smaller boats. Accordingly, the Corps of Engineers hired a helper boat to assist tows in making the passage between Lock 49 across the river over to the Uniontown Locks or in reverse from the Uniontown Locks over to Lock 49, according to their up or down passage in the river. The Corps of Engineers within its discretion hired the helper boat until and while removal of the sunken barges was completed by the defendant, for the purpose of avoiding a "major accident" and thus safeguard the health, safety and property of those in the area from the hazardous conditions ultimately caused by the defendant's sunken barges in the river.
 
 
 26
 The defendant's pilot in pushing the 17 ore laden barges chose the turbulent river passage in preference to the calm waters in the main Uniontown Lock. He knew that he had chosen a hazardous waterway because he admitted it. He admitted also that it was the high speed of full throttle with the heavy tow in front which caused the three foremost barges to sink. As a licensed pilot for the Ohio River with various and variable hazards, he was required to know of the dangers and conditions of every part of the river over which he navigated. Had he done as the captain of the boat said he would have done, that is, slow down the speed of the tow and thus been able to control, and if he was alert and he should have been alert, he would have been able to have drawn back and saved the barges from going down. He was supposed to have been an experienced licensed pilot and he should have foreseen the hazards involved. His failure to do that which ordinarily, as stated by the captain, should have been done under all the circumstances, was a total account of negligence. It is necessary to add the potential negligence of the captain himself, who admittedly knew of the hazardous conditions which were about to be encountered by the heavy, ore laden barge tow, but he nevertheless retired and left the piloting in the hands of one who the captain knew, or should have known, was unable to or careless enough to negotiate the turbulent river passage in this area in the manner in which he did, as he said he, himself, would have done.
 
 
 27
 Thus, the defendant's negligence and careless actions by its agents causing the sinking of the three foremost barges and causing the navigable obstruction in the river was in violation of Sec. 15 of the Rivers and Harbors Act of 1899 (33 U.S.C. Sec. 409). Neither the United States nor any of its agents contributed in any way to the negligence of the defendant, but at all times the defendant had available to it a free and safe passage through the main Uniontown Lock which the defendant could have used without harm or hazard to itself or anyone else.
 
 
 28
 And because the defendant was proximately and totally negligent in causing the damages to the plaintiff, and because the hiring of a helper boat as a protective cost while removal of the barges ensued, was necessary and reasonable under the circumstances for the government and its public agencies to preserve the welfare and safety of the public, the defendant is obligated to pay, and the plaintiff is entitled to receive, the sum of $15,680.00.
 
 II.
 
 29
 On this second appeal, OBL makes two arguments: First, OBL contends that, assuming arguendo that the court below was justified in finding OBL negligent, the court erred in determining that the cost of the helper boat was a "removal expense." Second, OBL contends that the finding of negligence is clearly erroneous. We will address these issues in reverse order, for if OBL is absolved of negligence, the question of liability to reimburse the United States for sums allegedly spent on removal does not arise.
 
 
 30
 A. Was OBL negligent?
 
 
 31
 The quoted excerpts from the district court's opinion on remand set forth in detail the factual findings which were the basis for the district court's conclusion that both the pilot and the captain of M/V STEEL FORWARDER were negligent. The testimony of record amply supports those findings. The district court's conclusion that the sinking of the three barges was the result of OBL's negligence is unassailable.
 
 
 32
 B. Was the cost of the helper boat a "removal expense"?
 
 
 33
 As we have already pointed out, section 15 of the Rivers and Harbors Act of 1899 makes it unlawful "voluntarily or carelessly"--i.e., deliberately or negligently--to "sink ... vessels or other craft in navigable channels...." Further, section 15 imposes on the owner of a sunken craft the duty "to commence the immediate removal of the same ... and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States...." And in Wyandotte the Court held that, where the owner of a barge negligently sunk in the Mississippi declined to remove the barge, the United States could remove the barge and then sue to recover the cost of removal.
 
 
 34
 In the case at bar, OBL agreed to assume responsibility for raising the three barges that blocked the channel below the Uniontown pass after they were lost by M/V STEEL FORWARDER on June 27, 1972. To that end, OBL employed a salvage firm which raised the three barges in July and August. While the salvage process was going on, the "helper boat," M/V JEFFERY LYNN, was assisting river craft on the difficult passage between Lock 49 and the Uniontown lock. Throughout this litigation the United States has contended that the $15,680 spent by the Corps of Engineers to hire the services of M/V JEFFERY LYNN was a "removal expense" that supplemented the salvage process and hence was properly chargeable to OBL. On remand, the district court so found. To the correctness of that finding we now turn.
 
 
 35
 The core of the district court's finding with respect to the function of M/V JEFFERY LYNN is that "[t]he Corps of Engineers within its discretion hired the helper boat until and while removal of the sunken barges was completed by the defendant, for the purpose of avoiding a 'major accident' and thus safeguard the health, safety and property of those in the area from the hazardous conditions ultimately caused by the defendant's sunken barges in the river." The legal sufficiency of this finding turns in substantial measure on the breadth of the constituency the district court had in mind in speaking of protecting "those in the area" from a " 'major accident.' " If "those in the area" are to be understood as confined to the crews of the river craft aided by M/V JEFFERY LYNN, the United States' claim for reimbursement for the hire of the helper boat is weakened. The nexus between protecting those crews and completing the salvage process seems so attenuated that it would be hard to make the case that such safety measures, however intrinsically worthwhile, come within the scope of OBL's section 15 liability to reimburse the United States "for the Government's expenses incurred in removing a negligently sunk vessel." Wyandotte, supra, 389 U.S. at 204, 88 S.Ct. at 387.
 
 
 36
 However, it is evident that the district court understood that the helper boat's mission was to protect not only the crews of the river craft but all other personnel working in the neighborhood of the Uniontown dam and lock from a " 'major accident.' " This clearly appears from the testimony of Corps of Engineers official Vanzant:
 
 
 37
 Q. What was the primary reason for entering into the contract with the Jeffery Lynn?
 
 
 38
 A. Well, primarily the time that it took to make the crossing, the fact that the salvage operator with his crew were working in the section or in the, on the barges in raising the barges down below the bay section and the fact that prior to that we had not--I don't like to say complaints--conversations with waterway operators particularly in the Paducah area that had had trouble getting over and getting lined up even to use the best section of the Uniontown Pass prior to the sinking and during stages when, you know, 49 was in operation.
 
 
 39
 So, in order to, to make as an expeditious and possible transit in as safe a manner as you could possibly make it, so that you didn't have a major accident wherein the people that were working on the cofferdam, the people at the lock, and as I say, in addition to the contractor's personnel working down in the chute, then to preclude anything happening, I thought that it is necessary to provide the helper boats so that you didn't have--there would be no possibility of it.
 
 
 40
 In sum, the work performed by M/V JEFFERY LYNN was intended to protect all those engaged in navigation, construction and salvage in the vicinity of the Uniontown dam and lock. The propriety of characterizing the cost of this work as a "removal expense" is made plain by Wyandotte.[3] As already noted, the Court there sustained the United States' entitlement to seek reimbursement for expenditures incident to the removal of a barge negligently sunk in the Mississippi. President Kennedy officially proclaimed the sinking a "disaster" for the reason that the barge was carrying 1000 tons of liquid chlorine. The Corps of Engineers spent upwards of $3,000,000 in connection with raising the barge and its deadly cargo. Of this sum, "approximately $1,565,000 was for engineering costs; the remainder, some $1,516,000, was for public health and safety measures, including allegedly necessary precautions against a possible rupture of the chlorine containers during salvage operations." 389 U.S. at 196 n. 4, 88 S.Ct. at 383 n. 4. Following Wyandotte, we hold in the case at bar that the sum spent by the Corps of Engineers to hire M/V JEFFERY LYNN to "safeguard the health, safety and property of those in the area," including the salvage crews,[4] was a proper "removal expense."[5]
 
 III.
 
 41
 For the foregoing reasons, the judgment below will be affirmed.
 
 
 
 *
 Hon. Louis H. Pollak, United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Uniontown, Kentucky is 3.5 miles upstream from the lock and dam. 458 F.Supp. at 1088. A similar distance downstream (i.e., west) is where the Wabash--the boundary between Indiana and Illinois--flows into the Ohio. See Rand McNally World Atlas (Int. ed., 1941) 89, 96
 
 
 [2]
 Consolidated with Wyandotte in the district court and the Court of Appeals for the Fifth Circuit, as well as in the Supreme Court, was United States v. Cargill, Inc., raising cognate but discrete issues with respect to the scope of the obligation to remove sunken craft. It is the facts and law of Wyandotte which have controlling significance for the case at bar
 Contemporaneous with the Fifth Circuit decision, 367 F.2d 971, affirmed by the Supreme Court in Wyandotte, was another Fifth Circuit decision evincing a similarly hospitable attitude toward the Rivers and Harbors Act. See China Union Lines, Ltd. v. A.O. Andersen & Co., 364 F.2d 769, 792-93 (5th Cir.1966) ("expense of stand-by tug to prevent the vessel from moving and re-blocking the channel" held an "expense of removing" within the meaning of section 20 of the Act, 33 U.S.C. Sec. 415).
 
 
 [3]
 Ten years after Wyandotte, the Fifth Circuit observed: "By enacting the Rivers and Harbors Act, Congress sought to keep our navigable streams navigable by authorizing the removal of obstructions placed thereon; in construing that statute in Wyandotte, the Court sought to ensure that the Act would cast the cost for removal on those who did the obstructing." University of Tex. Med. Branch at Galveston v. United States, 557 F.2d 438, 455 (5th Cir.1977). Cf. China Union Lines Ltd. v. A.O. Andersen & Co., supra, note 2
 
 
 [4]
 Crucial to our determination is the fact that the salvage crews-- i.e., personnel actually engaged in removing the sunken barges--were among the personnel whose safety the Corps of Engineers was undertaking to protect
 
 
 [5]
 In Wyandotte, after identifying the expenditures for "engineering costs" and for "public health and safety measures, including ... precautions against a possible rupture of the chlorine containers during salvage operations," the Court declined to "pass on the questions whether all of these expenses were necessary to remove the barge...." 389 U.S. at 196 n. 4, 88 S.Ct. at 383 n. 4. The district court in Wyandotte had granted summary judgment against the United States on the theory that section 15 created no implied cause of action entitling the United States to recover removal expenses from the owner of a negligently sunken barge. The Court's contrary reading of section 15 meant that on remand the district court would have to determine the issue of negligence; presumably, a finding by the district court of negligence would have then triggered inquiry into damages: specifically, whether all or some of the various categories of costs incurred by the Corps of Engineers were "removal expenses"--i.e., expenses linked to the salvage operations. In the case at bar, the United States seeks reimbursement for only one expenditure--the cost of hiring M/V JEFFERY LYNN. That single expenditure was intended to protect numerous persons "in the area," including the salvage crews, from a " 'major accident.' " We think, therefore, that the district court was correct in treating the entire $15,680 as a single reimbursable "removal expense."
 Noting that the Corps of Engineers left it up to the captain of each transiting river craft to determine whether to make use of the helper boat, OBL argues that the Corps of Engineers could not have been seriously interested in protecting the safety of all those working in the area. But the fact that the Corps of Engineers was prepared to delegate the decision whether to use the helper boat to individual captains, in apparent accord with river custom, does not seem to us to vitiate the Corps' judgment. The district court noted that "the Corps of Engineers determined, as it had the discretionary power to do, that a helper boat should be made available to traffic when needed." We cannot say that this was clearly erroneous.