BUNGE CORPORATION, Plaintiff,

v.

AGRI–TRANS CORPORATION,
Defendant.

AGRI–TRANS CORPORATION, Plaintiff,

v.

GLADDERS BARGE LINE, INC., et
al., Defendants.

Nos. GC 79–106–WK–O, GC
80–224–WK–O.

United States District Court,
N. D. Mississippi,
Greenville Division.

July 15, 1982.
As Amended Aug. 4, 1982.

sunken vessel in navigable waters? Second, may the non-negligent owner of an abandoned sunken vessel obtain declaratory relief against the government's demand that it remove the wreck? Third, whether the government in one case established the sunken vessel to be a hazard to navigation or obstruction to the navigable capacity of the Mississippi River so as to require removal? For reasons that follow, we answer no to the first and third questions and yes to the second.

On April 25, 1979, the M/V JEAN GLADDERS, owned and operated by Gladders Barge Line, Inc. (Gladders), was proceeding downbound on the Mississippi River in the vicinity of Vicksburg, Mississippi, with a tow that included two barges of Bunge Corporation, Bunge 107 and Bunge 408, and two barges of Agri-Trans Corporation, AT–73 and AT–104. The voyage proved to be ill-fated in that the JEAN GLADDERS and its tow first struck the Vicksburg bridge, causing the sinking of the two Bunge barges and AT–73, and three days later collided with U. S. Highway 190 bridge at Baton Rouge, Louisiana, which caused the sinking of a fourth barge, AT–104. No one has attempted to remove any of the wrecks and they remain on the bottom of the river.

On June 14, 1979, Bunge filed suit against Agri-Trans, GC 79–106, for its cargo, barge and other losses, alleging that the latter company had orally agreed to tow the Bunge barges and was, therefore, responsible for the loss. Agri-Trans impleaded Gladders since the JEAN GLADDERS, at the time of the Vicksburg casualty, was being operated under a fully found charter from its owner, and asserted that Gladders was responsible for Bunge's loss as well as Agri-Trans' own loss. On November 29, 1979, Agri-Trans filed its complaint in the United States District Court for the Eastern District of Louisiana against the M/V JEAN GLADDERS *in rem* and Gladders *in personam*. By agreement of the parties, the cause was on October 1, 1980, transferred to this court, and docketed as GC 80–224. Shortly thereafter the two cases were consolidated. Agri-Trans later amended its

Frank S. Thackston, Jr., Greenville, Miss., for Bunge.

Terry A. McCall, New Orleans, La., for Agri-Trans.

Joel J. Henderson, Greenville, Miss., for Gladders.

Debra Kossow, Dept. of Justice, Washington, D. C., for the U. S.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In these consolidated admiralty actions, three questions arise. First, may the non-negligent owner of an abandoned sunken vessel obtain "prospective" indemnity against the negligent sinker for claims of third parties that might be asserted at some future date because of the presence of the

suit adding the Secretary of the Army, United States Army Corps of Engineers and the United States as additional defendants in its original action to seek declaratory relief against the government as the result of its abandonment as owner of AT–104. The United States and its officers counterclaimed against Agri-Trans demanding that it abate the nuisance created by the sunken barge AT–104, and be required to remove the wreck or else be held liable to the government for removal costs. The federal defendants cross-claimed against Gladders for the same relief.

At a pretrial conference before the United States Magistrate on January 12, 1982, Bunge, Agri-Trans and Gladders disclosed that Gladders had discharged all claims of Bunge and Agri-Trans for money damages sustained when their barges and cargo sank in the collisions with the Vicksburg and Baton Rouge bridges. The essential facts, which were largely stipulated by the parties, are set forth below.

## I.

(a) *Vicksburg Bridge Collision.*

The sole cause of the collision of the JEAN GLADDERS and her tow on April 25, 1979, which resulted in the sinking of the two Bunge barges and the one Agri-Trans barge in the navigable channel of the river below Vicksburg, was the negligent operation, fault and/or unseaworthy condition of the JEAN GLADDERS and her crew. No negligence or fault of Bunge or Agri-Trans, or unseaworthiness of their barges, caused or contributed in any way to the collision, or subsequent sinking of the three barges. As conceded by the parties, Gladders was the "negligent sinker," Bunge the "non-negligent owner" of Barges 107 and 408, and Agri-Trans the "non-negligent owner" of AT–73, for the purposes of this collision and sinking of the barges. On May 2–3 the stabilized locations of the three sunken barges were ascertained. Bunge 107 was found to be at a water depth of 76 feet near mid-river, abreast the fueling dock of the Baxter Wilson Steam Plant on the left descending shore, at mile 433.2. The highest point of the wreck as disclosed by profile was 68 feet below the river's surface on the Vicksburg river gauge of 49.6 feet. Bunge 408 was located at mile 435.5, about 1180 feet off the left descending shore, with the highest protrusion of the wreck 81 feet below the water surface. Immediately following the collision, Barge AT–73 was seen partially sunk and grounded at mile 426.5 on the left descending shore; a day or two later it became entirely submerged. This sunken barge was last determined to be 1000 feet off the left bank and 47 feet below the surface of the river at a Vicksburg river gauge reading of 47.2 feet. Although the lowest Vicksburg water stage in the last 10 years has been minus 2 feet, which would expose above water a portion of AT–73, the barge is so positioned on a sandbar, in 'sanded-in' fashion so as to cause a shallow draft vessel operating in the area at a water stage of minus 2 feet or less to strand on the sandbar before reaching any exposed portion of the barge AT–73.

On July 11, 1979, Bunge tendered written abandonment of its two sunken barges to the Army Corps of Engineers at Vicksburg, which on July 20 acknowledged the notice as follows: "This acknowledgement should in no way be construed as acceptance by the United States of an abandonment of such vessels, nor of waiver of any right to enforce liability for any damage caused by its sinking or cost of removal." This decision was, of course, mandated by federal regulation.[1] On April 19, 1980, Agri-Trans ten-

---

1. 33 C.F.R. § 309.190(e)(1) prohibits the United States from taking any position with respect to sunken wrecks. This regulation states:
 Abandonment of wrecks by owners or underwriters. (1) Every precaution should be taken in cases involving wrecks or sunken vessels to insure that the rights of the United States are not prejudiced by acceptance of

abandonment when tendered by owners or underwriters of vessels under 33 U.S.C. 409. Under no circumstances will acceptance of abandonment be indicated. If a letter of abandonment is received, receipt of the letter is merely acknowledged and a statement included in the reply as follows: "This acknowledgement should in no way be con-

dered written abandonment of Barge AT–73 to the Army Corps of Engineers at New Orleans, which merely acknowledged receipt of the communication. Also, Agri-Trans advertised notice of abandonment in the Vicksburg newspaper over a four-week period.[2] After the receipt of these communications, the Corps of Engineers made no effort to commence removal of the wrecks or to mark any of the sunken vessels other than to temporarily mark Bunge 408. This marking was discontinued on July 11, 1979; since that time no further marking has been made by anyone. At trial, neither Bunge nor Agri-Trans tendered credible evidence that the wrecks at Vicksburg have been or presently are either an obstruction to the navigable capacity of the river under 33 U.S.C. § 403,[3] or a hazard to navigation under 33 U.S.C. § 409.[4] Upon the conclusion of their case, Gladders moved for directed verdict, which motion was overruled without prejudice to later disposition. Gladders then offered Austin Smith, a civil engineer and expert hydrologist, who testified that the three sunken barges were grain hopper barges which appeared to be stabilized on the river bottom from a silt-

ing-in process. In Smith's opinion they presented no reduction in the navigable capacity nor a hazard to safe navigation. L. C. Fumbanks, III, Chief of the Vicksburg Navigation Section of the Army Corps of Engineers, detailed efforts made to locate the barges following the collision and testified that the Corps made no reports to mariners after April 20, 1979, concerning interference to navigation by the sunken barges. No complaints from navigators in the area had been received at any water stage, and river traffic continues to move without incident over the unmarked submerged barges.

(b) *Baton Rouge Bridge Collision.*

As at Vicksburg, the sole cause of the collision of the JEAN GLADDERS and her tow on April 28, 1979, with the U. S. Highway 190 bridge at Baton Rouge, and the sinking of AT–104, was the negligent operation, fault and/or unseaworthy condition of the JEAN GLADDERS and her crew. No negligence or fault on the part of Agri-Trans or unseaworthiness of its barges, in-

---

strued as acceptance by the United States of an abandonment of such vessel, nor as waiver of any right to enforce liability for any damage caused by its sinking or cost of removal."
The Engineers' position did not change despite subsequent letters from Bunge's counsel stating that their reply declining to take a position was "the most equivocal item of correspondence that I have received in some time."

2. This advertised notice read as follows:
 "As a result of collision, the Barge AT–73 sank in the Mississippi River at approximately 2030 hours on April 25, 1979, in the vicinity of Mile 428 A.H.P. Notice is hereby given that Agri-Trans Corporation, owner of the Barge AT–73, has abandoned all right, title and interest in the said vessel."

3. § 403. Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in
 The creation of any obstruction not affirmatively authorized by Congress, to the *navigable capacity* of any of the waters of the United States is prohibited; ... (Our emphasis).

4. § 409. Obstruction of navigable waters by vessels; floating timber; marking and removal of sunken vessels

It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as "sack rafts of timber and logs" in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, *it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned*, and the neglect or failure of the said owner so to do shall be unlawful; and it *shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently*, and *failure to do so shall be considered as an abandonment of such craft*, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title. (Our emphasis).

cluding the AT–104, caused or contributed in any way to the collision and subsequent sinking of the AT–104. As conceded by all parties, Gladders was the negligent sinker, Agri-Trans the non-negligent barge owner for the purpose of this collision and wreck.

This barge sank at mile 233.1 near midstream. When located on August 7, 1979, the wreck was buried underneath the river bottom with 46 feet of water above the river bed on a local river gauge reading of 20.3 feet. Five months later, January 3, 1980, the barge was found to be exposed above the river bottom due to the scouring action of silt, and 49 feet of water covered the highest portion of the barge while 55 feet covered the river bottom adjacent to the barge. The Baton Rouge river gauge on that date was 20.9 feet. From mile 233.1 upriver to the U. S. Highway 190 bridge, the project depth of the Mississippi River which the Corps maintains is 40 feet, with a minimum width of 500 feet in the ship channel. The barge was positioned 500 feet west of the western line of the ship channel which is approximately 1100 feet wide in this immediate area. The width of the navigable water at and below Baton Rouge, however, varies, depending on the stage of the river. Agri-Trans' surveyor obtained data respecting the underwater location of several Monterey Pipeline Company pipelines running near the right descending bank and determined that the sunken AT–104 was lying atop the upstream pipeline.

On May 4, 1979, the Corps of Engineers requested Agri-Trans to furnish additional information about the sinking of the AT–104 and advised that "since the vessel in its present location could constitute a hazard to navigation, it should be removed immediately." On May 10, Agri-Trans responded that it proposed to mark the barge "within the next two to three weeks, and we intend to remove the AT–104 when the river reaches the proper gauge for a salvage op-

eration." Monterey Pipeline Company also inquired of Agri-Trans concerning the removal of AT–104 from the pipeline. On June 8, Agri-Trans notified the Corps and Coast Guard that it had marked the sunken barge as of May 29, through the services of a New Orleans surveyor. The Corps on August 29, 1979, notified the surveyor that the sunken AT–104 located over or adjacent to pipelines "could represent a future liability to its owner should it interfere with pipeline operations or dredging requirements in the area."

On October 31, 1979, Agri-Trans tendered written notice of abandonment of AT–104 to the Army Corps of Engineers at New Orleans, which on November 14, 1979, acknowledged receipt of the notice. This acknowledgement was couched in the Corps' standard language as recited above, and informed Agri-Trans of the proximity of the Monterey pipelines. Agri-Trans also tendered written notice of abandonment to the U. S. Coast Guard, which summarily rejected it. For four successive weeks in November 1979, and again in March and April, 1980, Agri-Trans advertised notice of abandonment of the barge in the Baton Rouge newspaper.[5]

At trial the government offered no live testimony and was content to rely upon the correspondence between the Corps, the Coast Guard and Agri-Trans and its surveyor from May through August, 1979.

According to a nautical chart (A–6) presented by Agri-Trans, a shallow water shelf extends from U. S. Highway 190 bridge downstream from the right descending bank to mile 232.6. There are no anchorages in the Baton Rouge harbor off the right descending bank between the bridge and mile 232. All deep draft wharves and docks are located on the left descending bank at mile 233.7 (Kaiser Aluminum and Chemical Corp.), mile 233.1 (ICI Americas Chemical), and mile 232.4 (Exxon Co.). The nautical chart also shows a trough sixty

5. This advertised notice read as follows:

As a result of collision, the Barge AT–104 sank in the Mississippi River at 8:00 p.m. on April 28, 1979 in the vicinity of mile 233.0

A.H.P. Notice is hereby given that Agri-Trans Corporation, owner of the Barge AT–104, has abandoned all right, title and interest in the said vessel.

feet deep opposite the Kaiser Aluminum and ICI Americas facilities, as part of the ship channel which varies from 600 to 800 feet in width.

Austin Smith was recalled by Gladders to testify as to the position of AT–104 and its potential to obstruct navigable capacity or constitute a hazard to navigation. He testified that AT–104 should remain in its present location because of evident silting on the river bed. Although Smith was admittedly not qualified to testify as an expert concerning ship piloting procedures, he had witnessed deep draft vessels navigate in the Baton Rouge harbor, and, with the help of a tug, complete a 180° turn south of U. S. Highway 190 bridge without exceeding the boundaries of the 40-foot ship channel. Undisputed data show when the local river gauge is 0, 26 feet of water would be present over the river bottom adjacent to the sunken barge; thus, at any time the gauge was 14 feet or more, a mariner would expect to have 40 feet of water, absent the sunken barge. During 1979–81, the Baton Rouge gauge registered more than 14 feet for 21 out of 36 months. At a gauge of 20 feet or more, a deep draft vessel, should it pass over the submerged AT–104, would encounter no hazard since the water surface at any such reading would be more than 40 feet above the protruding portion of the wreck. This would reduce critical gauge readings to between 14 and 20 feet, which occurred 240 days during the 1979–81 period. Be that as it may, the government presented no evidence that ocean-going vessels have ever attempted to navigate, or are likely to navigate, 500 feet west of the west line of the ship channel whenever there is a river stage of 14 feet or more.

According to Smith's uncontradicted testimony, the ship channel is marked by lights from Baton Rouge to New Orleans. The "warping" procedure, employed by ship pilots to effect a 180° turn, allows deep draft vessels 800 to 1000 feet long to navigate a channel only 1100 feet wide. Therefore, Smith's opinion was that deep draft vessels could navigate the channel without interference from the wrecked AT–104, and though the wreck lies in navigable waters,

he concluded that since only barge traffic would navigate over and in the immediate vicinity of the sunken AT–104, the navigable capacity of the river was not reduced, nor was the sunken barge an obstruction to navigation.

The court finds as a fact that, although Agri-Trans first intended to remove the AT–104, it decided in November 1979 to abandon the vessel by taking affirmative steps of notifying the Corps of Engineers as well as the general public. The court further finds that the government failed to establish that the sunken AT–104, in its present location in the Baton Rouge harbor, either obstructs navigable capacity or is a hazard to navigation.

## II. PROSPECTIVE INDEMNITY

Although Bunge initially sought recovery from Agri-Trans for monetary damages for loss of its barges and their cargo incident to the Vicksburg bridge collision, Bunge's sole claim at this time is one for indemnity against Agri-Trans as to future liability it might possibly incur by reason of the sunken barges. Agri-Trans contends any indemnity due Bunge in relation to Bunge barges 107 and 408 is due from Gladders, not Agri-Trans. In addition, Agri-Trans seeks prospective indemnity from Gladders for future liability arising from the sunken wreck of AT–73. Because of the wholly prospective nature of this remedy, this court must first determine the ripeness of the claim for judicial determination. Only then would a consideration of the availability of such relief be proper.

(a) *Justiciability of Claim.*

As a general rule for determining ripeness, the Supreme Court has held:

The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests .... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). Although this rule may be difficult to apply, the Fifth Circuit has specifically held that the threat of litigation potentially resulting in liability must be imminent and not contingent on future events. *See Exxon Corp. v. Busbee*, 644 F.2d 1030, 1031–32 (5 Cir. 1981) (mere contingency of future litigation insufficient as basis of present judicial action); *Federal Election Comm'n. v. Lance*, 635 F.2d 1132, 1138 (5 Cir. 1981) (issues involving contingent future events which may not occur as anticipated, or may not occur at all, are not justiciable). This rule has its origin in Art. III of the United States Constitution and is not relaxed by the Declaratory Judgment Act, 28 U.S.C. § 2201. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 71 n.15, 98 S.Ct. 2620, 2629 n.15, 57 L.Ed.2d 595, 610, n.15 (1978) (Declaratory Judgment Act does not expand jurisdiction); *Ashcroft v. Mattis*, 431 U.S. 171, 172, 97 S.Ct. 1739, 1740, 52 L.Ed.2d 219, 222 (1977) (for declaratory judgment there must be dispute which calls for adjudication of present right upon established fact, not advisory opinion).

Bunge as well as Agri-Trans admit their actions are predicated on apprehensions that, *inter alia*, third parties navigating the river might be damaged by the sunken wrecks thereby obligating Bunge to defend a liability suit, and that the federal government might change its mind and require Bunge and Agri-Trans to pay the cost of removal of the three barges below Vicksburg. Because we find as a fact that

Bunge barges 107 and 408 as well as AT–73 were abandoned by their owners, as discussed below, there is no imminent threat of litigation potentially resulting in Bunge's or Agri-Trans' liability to the government or to third parties. Therefore, we find the parties have not presented this court with a ripe justiciable controversy.[6]

(b) *Abandonment.*

■ Bunge and Agri-Trans attempt to maintain their actions as requests for indemnity for potential liability as a result of the sinking of Bunge barges 107 and 408 and AT–73. In the usual case, the party seeking indemnification has been "compelled to pay what another in justice ought to pay" and is seeking from the latter the amount paid. 42 C.J.S. Indemnity § 20, p. 594 (1944). However, in this case Bunge and Agri-Trans seek indemnity for possible future claims lodged against them by third parties or by the government. Assuming, *arguendo*, that indemnity may be granted prospectively, the one seeking indemnity must show at least potential legal liability to another who may sustain some kind of loss at a future date.[7] *See, e.g.*, 42 C.J.S. Indemnity § 25, p. 603 (1944) (one seeking indemnity must prove actual legal liability to injured party); *Tokio Marine & Fire Ins. Co., Ltd. v. McDonnell Douglas, Corp.*, 465 F.Supp. 790, 794 (S.D.N.Y.1978) (same); *Southwest Mississippi Elec. Power Ass'n. v. Harragill*, 182 So.2d 220, 223 (Miss.1966) (same). *Cf. Odd Bergs Tankrederi A/S v. S/T Gulfspray*, 650 F.2d 652, 654 (5 Cir.

**6.** Agri-Trans' reliance on *Shinnihan Kisen K.K. v. Jarka*, 1964 A.M.C. 1455 (D.Mass.1964), is misplaced. Although the court found a case or controversy and granted prospective indemnity, in *Jarka* a state court action had already been filed for damages by a third party. The indemnity granted in *Jarka* was prospective only in that judgment had not yet been rendered. No such imminent threat of litigation or other demand by any party is shown in the case sub judice.

**7.** Bunge cites *Stevens v. East-West Towing Co., Inc.*, 649 F.2d 1104 (5 Cir. 1981), for the proposition that a breach of the warranty of workmanlike performance owed by Agri-Trans to Bunge gives Bunge a right of indemnity. This

would be true if, as in *Stevens*, the barge owner were *liable* to an injured third party. In addition, Bunge asserts that since a technically or passively negligent party is entitled to indemnity from an actively negligent party, *Tri-State Oil Tool Industries Inc. v. Delta Marine Drilling Co.*, 410 F.2d 178 (5 Cir. 1969), then a non-negligent party (such as Bunge) likewise is entitled to indemnification. This reliance on *Delta Marine* is incorrect. *Delta Marine* merely affirms that maritime law provides for tort indemnity where there is no negligence or only passive negligence attributed to the indemnitee. *Id.* at 186. It does not do away with the requirement that the indemnitee show some type of legal *liability* to the injured party.

1981) (right of indemnity arises from duty indemnitor owes indemnitee who is liable to injured party). This, Bunge and Agri-Trans have failed to do.

▮ The fears of Bunge and Agri-Trans that they will be later subject to demands by the government or third parties may be put to rest by resolution of the question of abandonment of the sunken barges. Section 15 of the Rivers & Harbors Appropriation Act, 33 U.S.C. § 409, commonly known as the Wreck Statute, states:

Whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidently or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it . . . and to maintain such marks until the sunken craft is *removed or abandoned,* . . . (emphasis added).

This statute recognizes the preexisting maritime right to abandon a wrecked vessel and allow the owner, who has already suffered the misfortune of losing his ship, to limit his exposure for the cost of removal to liability *in rem* against the vessel and cargo. *See, e.g., United States v. Bethlehem Steel Co.,* 235 F.Supp. 569 (D.Md.1964) (purpose of abandonment to allow owner to limit liability to value of vessel and cargo); *Petition of Boat Demand, Inc.,* 174 F.Supp. 668 (D.Mass.1959) (same); *Petition of Highlands Nav. Corp.,* 29 F.2d 37, 38 (2 Cir. 1928) (general maritime right to abandon). Under this section, however, only a non-negligent owner may abandon a sunken vessel; the negligent owner may not do so. *Lane v. United States,* 529 F.2d 175, 177 (4 Cir. 1975). As stated by the Fifth Circuit in *Tennessee Valley Sand & Gravel Co. v. M/V DELTA,* 598 F.2d 930, 934 (5 Cir. 1979):

The owner of a vessel sunk without any negligence on his part is still subject to the statutory obligation to remove the wreck, but is given an option: he may either raise the vessel himself and seek recovery of the expenses from the party responsible for the sinking, or he may abandon the vessel and allow the United States to bear the burden of removal and recovery of expenses from the negligent party. *If the non-negligent owner exercises his right to abandon, he is liable neither for the cost of removal nor for damages suffered by third parties as a result of the wreck.* (Citations omitted) (Emphasis added).

*See also St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co. Inc.,* 666 F.2d 932, 940 (5 Cir. 1982); *Mecom v. Levingston Shipbuilding Co.,* 622 F.2d 1209, 1212 (5 Cir. 1980). Since it has been stipulated by the parties that neither Bunge nor Agri-Trans was negligent or otherwise responsible for sinking of the barges, it is clear that if the barges were effectively abandoned, their former owners are liable to no one.

▮ Whether a sunken wreck has been abandoned is a question of fact. A valid abandonment may be accomplished by either an express or implied act of leaving or deserting property without hope of recovering it and without the intention of returning to it. 3A Benedict on Admiralty § 134 (7th ed. 1980). This determination is aided by a presumption that a sunken vessel has been abandoned if not removed within 30 days. 33 U.S.C. § 414. *See also The Snug Harbor,* 40 F.2d 27, 29 (4 Cir. 1930) (§ 414 provides 30 day period before abandonment complete if not legally established in less time); *Jones Towing, Inc. v. United States,* 277 F.Supp. 839, 848 (E.D.La.1967) (where owner fails to remove sunken barge within 30 days after sinking, barge is presumed to have been abandoned to United States by operation of law); *Thames Towboat Co. v. Fields,* 287 F. 155 (D.C.N.Y.1922) (same). Bunge barges 107 and 408 and the AT-73 were sunk in the Mississippi River on April 25, 1979. On July 11, 1979, Bunge tendered written notice of abandonment of its sunken barges 107 and 408 to the Corps of Engineers. Agri-Trans tendered written notice of abandonment of its sunken barge AT-73 to the Corps of Engineers on March 19, 1980, and published notice of abandonment in the Vicksburg newspaper. It is difficult to imagine what more express method of abandonment could have been used. Not only is there a presumption that

the barges were abandoned as of May 25, 1979 (30 days after the sinking), but the owners expressly notified the Corps of Engineers as well as the public of their desertion of the barges without hope of recovering or returning to them. We therefore find as a fact that Bunge abandoned its barges 107 and 408 and that Agri-Trans abandoned its barge AT–73.

Since both Bunge and Agri-Trans abandoned their barges, they cannot show potential legal liability to any third parties injured at a future date as a result of the barges sinking. It therefore follows that neither Bunge nor Agri-Trans is entitled to indemnity. *See* note 7 and accompanying text, *supra.*

### III. AGRI–TRANS' REQUEST FOR DECLARATORY JUDGMENT

Agri-Trans also requests declaratory relief that all rights, title and interest in barge AT–104 (the sunken barge at Baton Rouge) passed to the United States as a result of abandonment or, in the alternative, for mandamus requiring the United States to accept abandonment. The United States filed a counter-claim requesting an injunction against Agri-Trans, as owner of the AT–104, to remove the barge pursuant to 33 U.S.C. §§ 403 and 409 and the common law of public nuisance; or else that the United States be reimbursed for all expenses in the event it must remove the wreck.

 As we have held, where the non-negligent owner of a sunken vessel elects to abandon it, he is liable neither for damages to third parties as a result of the wreck nor to the government for the cost of removal. *See Tennessee Valley Sand & Gravel* and accompanying text at p. 969, supra. Here again, all parties stipulate that Agri-Trans was not negligent or otherwise responsible for the sinking of AT–104 at Baton Rouge. Therefore, Agri-Trans had the right to abandon the wreck and avoid all liability with respect to its removal. Following the casualty of April 28, 1979, the AT–104 sank in the Mississippi River at a location where it has since remained. Agri-Trans on Octo-

ber 31, 1979, tendered written notice of abandonment to the government. Because of this unequivocal notice of Agri-Trans' desertion of AT–104 without hope of recovering it, the expression of which was twice advertised in local newspapers, as well as § 414's presumption that a vessel is abandoned if not raised within 30 days, we find as a matter of fact and hold as of matter of law that Agri-Trans validly abandoned the AT–104. Suffice it to say that Agri-Trans' earlier expressions of an intent to remove, and its act of marking the AT–104 for a limited period of time immediately after the sinking, were effectively superceded by Agri-Trans' plain, unambiguous and deliberate act of abandonment. Under settled case law, Agri-Trans' abandonment of the barge cast upon the United States all incidents of ownership. *Lane v. United States*, 529 F.2d 175 (4 Cir. 1975). Therefore, Agri-Trans may not be responsible for either the cost of removal or damages to third parties. Since it is confronted with a present demand, Agri-Trans is entitled to declaratory relief against claims asserted by the United States.

### IV. GLADDERS' LIABILITY TO REMOVE AT–104

The government, in the event of Agri-Trans' nonliability for removal of AT–104, requests injunctive relief against Gladders, the negligent sinker, to remove the barge pursuant to 33 U.S.C. §§ 403 and 409 and the common law of public nuisance, or that the United States be reimbursed for expenses to be incurred in case of some future removal. The government also seeks a declaration against Gladders that until such time as the AT–104 is removed, Agri-Trans and/or Gladders be held responsible for any damage which may be caused by the presence of the sunken wreck in the Baton Rouge harbor.

 Once a non-negligent owner abandons the wrecked or sunken vessel, the government is vested with all incidents of ownership, and, dependent upon the particular circumstances, must use its discretion to either mark or remove the wreck. *Chute*

*v. United States,* 610 F.2d 7 (1 Cir. 1979); *Lane v. United States,* 529 F.2d 175 (4 Cir. 1975); *Jones Towing, Inc. v. United States,* 277 F.Supp. 839 (E.D.La.1967). If, in the exercise of reasonable care, the government determines the wreck should be removed, it may· either raise the vessel ànd seek reimbursement of costs or obtain an injunction directing the negligent party to remove the wreck. *Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *University of Texas Medical Branch at Galveston v. United States,* 557 F.2d 438 (5 Cir. 1977); *In re Marine Leasing Services, Inc.,* 328 F.Supp. 589 (E.D.La.1971), *aff'd.* 471 F.2d 255, 5 Cir. The government first asserts that under both § 403 and § 409 it may require ·removal of any wreck or sunken vessel within a body of navigable water, irrespective of whether the vessel obstructs navigation or reduces navigable capacity. We disagree. Section 409 provides: "It shall not be lawful to . . . voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels, . . . *in such manner as to obstruct, impede, or endanger navigation.*" 33 U.S.C. § 409. (Our emphasis). The language of § 409 has long been interpreted as requiring removal of the vessel only if it is an obstruction or hazard to navigation. *United States v. Cavalliotis,* 105 F.Supp. 742 (E.D.N.Y.1952) (government's failure to prove vessel constitutes obstruction precludes finding of guilt in criminal proceedings under § 409). In *United States v. Raven,* 500 F.2d 728, 732 (5 Cir. 1974), the Fifth Circuit recently held the purpose of this statute is to protect other vessels plying the same waters. A sunken vessel that presents no hazard to other vessels in the course of navigation is not an obstruction and hence not prohibited by § 409. Similarly, § 403 states: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited." 33 U.S.C. § 403. Obviously, the phraseology of § 403 is broader

than that of § 409, and requires somewhat different interpretation. In *Sierra Club v. Morton,* 400 F.Supp. 610 (N.D.Cal.1975), the court recognized the requirement of an obstruction and noted the difference between obstructions to navigation under § 409 and obstructions to navigable capacity under § 403: "The former denotes the actual, present obstruction of navigation while the latter denotes the potential or capacity to obstruct navigation currently or in the future." *Id.* at 629. We adopt the distinction made in *Morton.* Although a sunken barge under some circumstances could be an obstruction both to navigation and navigable capacity, *see United States v. Cargill, Inc.,* 367 F.2d 971 (5 Cir. 1966), *aff'd.* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407, the burden in any case rests upon the government when it seeks affirmative relief to prove the sunken barge is an obstruction within the meaning of § 409 or § 403, or both. *Cavalliotis, supra.* That a vessel lies at the bottom of a navigable channel does not, *ipso facto,* render it an obstruction to navigation or navigable capacity.

Unfortunately for its position, the government failed to carry the factual burden of establishing that the AT–104 is presently or likely to become an obstruction to navigation. *See* p. 967, *supra.* The government's proof is devoid of evidence that its officers have marked the abandoned AT–104, or have decided to raise it, or have warned mariners that the barge poses a hazard to reasonable navigation. Because the later failed to prove by a preponderance that the AT–104 is either an obstruction to navigation or navigable capacity, we must conclude as a matter of law that the government is not entitled to injunctive relief against Gladders to remove the barge. On the same reasoning the government is not entitled to a declaration against Gladders or Agri-Trans that they be held responsible for removal costs in the event the government may at some later date decide that AT–104 should be raised.[8]

---

**8.** We emphasize that this is not a case where the government has actually incurred expenses of removal because of concern in the exercise

of reasonable judgment in the protection of navigable waters, nor has a non-negligent owner incurred removal expenses. In those situa-

Our view of this case does not require us to decide what liability, if any, Gladders may have to subsequent third parties. *See Nunley v. M/V DAUNTLESS COLOCOTRON-IS*, 513 F.Supp. 720 (E.D.La.1981) (holding negligent non-owners not liable for damages to subsequent third parties).

Let judgment be entered accordingly.

tions, admiralty courts seem to apply a more relaxed standard for determining the reasonable necessity for such expenditures in granting reimbursement from the negligent sinker. *See, e.g., Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455, 463–65 (5 Cir. 1982) (application of subjective standard for determining necessity of removal); *Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930, 934–35 (5 Cir. 1979), *rehearing denied*, 604 F.2d 13 (party seeking reimbursement held to reasonable care standard in determining necessity to remove wreck).